# United States Court of Appeals
## For the First Circuit

---

Nos. 13-2237, 13-2294, 13-2369

ROSS W. GREENE,
Plaintiff, Appellant, Cross-Appellee,

THE CENTER FOR COLLABORATIVE PROBLEM SOLVING, INC.,
Plaintiff,

v.

J. STUART ABLON,
Defendant, Appellee, Cross-Appellant,

GENERAL HOSPITAL CORPORATION,
a/k/a Massachusetts General Hospital,
Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

---

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

---

Mark S. Resnick, with whom The Resnick Law Group, P.C. was on
brief, for appellant.
Denis M. King, with whom Thomas J. Sartory and Goulston &
Storrs PC were on brief, for appellees.

---

July 16, 2015

---

**LIPEZ, Circuit Judge**.  Dr. Ross W. Greene ("Greene") developed a method of treating children with explosive behaviors known as the Collaborative Problem Solving ("CPS") Approach. Greene advanced this method through his work at the Massachusetts General Hospital ("MGH") Department of Psychiatry, his unaffiliated private practice, and workshops and publications, including a book he wrote himself called The Explosive Child and a book he co-authored with Dr. J. Stuart Ablon ("Ablon") called Treating Explosive Kids.  After a falling out with both MGH and Ablon, Greene brought suit alleging, inter alia, that MGH had infringed his CPS-related trademarks and that Ablon had infringed his CPS-related copyrights.  MGH counterclaimed for ownership of the marks and prevailed on summary judgment.  Greene appeals that ruling.

The copyright claims present a more complicated scenario. The district court limited the scope of Greene's copyright claims by determining that the book he co-authored with Ablon, Treating Explosive Kids, was a joint work, but not a derivative work, under the Copyright Act.  Greene appeals that ruling, claiming that the court improperly circumscribed the evidence that he could present on his copyright infringement claim.  Greene's claim that Ablon created PowerPoint slides that infringed on his solo work, The Explosive Child, went to trial.  After a jury awarded Greene $19,000 on that claim, Greene moved for an accounting for profits Ablon derived from their joint work, Treating Explosive Kids, and

-2-

an injunction to prevent Ablon from further infringing on <u>The Explosive Child</u> -- remedies Greene had sought in his complaint and which the parties agreed would be submitted to the court after completion of the jury trial.  To contest the $19,000 jury award against him, Ablon moved for post-verdict relief.  The district court denied the various motions and both parties appeal.

We agree with the district court's capable handling of this complex case in all respects except one: the court erred in ruling that a work cannot be both joint and derivative as a matter of law.  However, we conclude that Greene has not shown that the error improperly circumscribed his copyright claim.  We therefore affirm.

## I. The Trademark Dispute

### A. Factual Background

#### 1. The CPS Marks

Greene is a psychologist who developed an alternative approach for the treatment of behaviorally challenging children. By 1993, with his method still developing, he began a sixteen-year employment relationship with MGH.  Throughout Greene's tenure at MGH, he continued to develop his method, including through studies he conducted at MGH.  He also continued to disseminate his method through, among other outlets, unaffiliated workshops and his unaffiliated private practice.  The development of Greene's method culminated in his 1998 book, <u>The Explosive Child: A New Approach</u>

for Understanding and Parenting Easily Frustrated, Chronically Inflexible Children ("The Explosive Child").  In 2001, Greene developed two service marks[1] to identify his approach: "Collaborative Problem Solving" and "Collaborative Problem Solving Approach" (collectively, the "CPS Marks" or the "Marks").

Between 2002 and 2003, Greene and his business partner, Ablon, co-founded three organizations devoted to the CPS methodology, each making use of the CPS Marks.  One of these organizations, the Collaborative Problem Solving Institute (the "Institute"), was an MGH-affiliated program within the MGH Department of Psychiatry.  The Institute relied on MGH's non-profit status to solicit tax deductible donations, which were placed in a "sundry fund" that MGH administered.  In addition, the MGH Development Office assisted with the Institute's fundraising efforts.  Greene served as the Institute's Director and identified himself as such in numerous flyers, books, papers, and articles, as well as on stationery and the Institute website, which were branded with the MGH logo.

The two other entities that Greene and Ablon founded, the CPS Clinic (the "Clinic") and the Center for Collaborative Problem Solving, Inc. (the "Center"), were Massachusetts sub-chapter S

---

[1] "Service marks and trademarks function to identify the source of services and goods, respectively."  Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 199 n.2 (1st Cir. 1996).

corporations. The Clinic (which later merged with the Center, retaining the Center's name) shared space at MGH with the Institute and accepted referrals from it. However, the Clinic and the Center were private practices not formally affiliated with MGH. To wit, in an email during the planning stages of the Institute, the MGH Office of General Counsel acknowledged that Greene's private practice and the Institute would share space and interact through referrals, but expressed a need to "mak[e] clear that the private practice is not associated or affiliated with MGH in any way." At all times, Greene has been the Center's President, and he and Ablon have been its sole and equal shareholders.

In 2007, the Institute rebranded itself as Think:Kids and began using the service marks "Think:Kids" and "Think:Kids Rethinking Challenging Kids" to identify its programming. Although the Think:Kids marks were affiliated with MGH, it was Greene and Ablon's unaffiliated Center that registered these marks with the U.S. Patent and Trademark Office ("USPTO") on the principal register.[2]

Greene has also sought to register the CPS Marks with the USPTO. Greene registered "Collaborative Problem Solving Approach"

_____

[2] In its Final Judgment and Declaration on MGH's summary judgment motion, the district court ordered the amendment of these registrations so as to make MGH the registrant instead of the Center. Greene does not contest that ruling. Therefore, this dispute only concerns the CPS Marks.

in his own name on the supplemental register[3] on July 9, 2002, noting February 15, 2001 as the date of first use. In 2008, about a year before this action began, he filed applications to register "The Collaborative Problem Solving Approach" and "Collaborative Problem Solving" on the principal register. When MGH learned that Greene was seeking to register these marks in his own name, MGH filed oppositions to his applications.[4]

**2. Greene's Employment Contracts with MGH and the IP Policy**

Greene's tenure at MGH ran from July 1993 to January 2009 and was the sum of ten consecutive appointments, each of which was six months to two years in length. The process for obtaining each appointment was the same.

First, Greene would sign and submit an appointment application in which he agreed to abide by MGH's bylaws and

---

[3] The supplemental register is a separate register for marks that are not yet eligible for registration on the principal register. See 15 U.S.C. § 1091(a). Marks registered on the supplemental register receive some but not all of the protections and legal advantages marks on the principal register receive. See How to Amend from the Principal to the Supplemental Register, USPTO, http://www.uspto.gov/trademarks/law/suppreg_ornamental.jsp (last modified Oct. 18, 2012).

[4] A person "who believes that he would be damaged by the registration of a mark upon the principal register" may oppose another person's application to register that mark by filing an opposition "stating the grounds therefor" with the USPTO. 15 U.S.C. § 1063(a).

policies.[5] Greene's first three applications, covering appointments from July 1, 1993 through December 31, 1996, stated, "I agree to abide by the Bylaws, rules, regulations and policies of the Professional Staff and of the Hospital." (Emphasis added.) Greene's fourth and fifth applications, covering appointments from January 1, 1997 through November 4, 1999, stated, "I agree to read and abide by the Bylaws, rules, regulations and policies of the Professional Staff and of the Hospital." (Emphasis added.) Finally, Greene's next (and last) five applications, covering appointments from November 5, 1999 through November 4, 2009, stated, "I have received and had an opportunity to read the Bylaws of the [Medical/]Professional Staff. I specifically agree to abide by all such bylaws and any policies and procedures that are applicable . . . ." (Emphasis added.)

In 2005 and 2007, as part of his final two applications, Greene also signed supplemental release forms, which stated, "I understand that the ownership and disposition of inventions and other intellectual property that I create during the time when I have my Professional Staff appointment shall be determined in accordance with the Intellectual Property Policy at the Hospital, a copy of which is . . . available at [URL]."

---

[5] Section 2.01 of the bylaws (in force at all relevant times) required Staff Members to abide by "all applicable . . . policies of the Hospital."

After submitting his applications, Greene would receive a letter informing him that the MGH Board of Trustees had appointed him to his position for a particular term. All eleven appointment letters[6] stated, "Enclosed is the Professional Staff Appointment Form which reflects the terms and conditions of the appointment." All eleven Professional Staff Appointment Forms stated, "In discharging the duties and exercising the privileges of your appointment, you are required to . . . [a]bide by the Bylaws, rules, regulations, and policies of the Professional Staff and the Hospital." (Emphasis added.) None of these forms state that MGH's policies might change from time to time.

MGH first enacted its intellectual property ("IP") policy on April 21, 1995. Consequently, MGH did not have an IP policy in place when Greene received his first three appointments in June 1993, May 1994, and January 1995. As enacted in 1995, the policy provided: "Trademarks shall be owned by MGH [1] if they are created by members in the course of their employment or affiliation with an Institution or [2] if they are used to identify any product or service originating with or associated with an Institution."

MGH updated its IP policy on July 19, 2002. In relevant part, the 2002 revisions added a third scenario in which MGH would

---

[6] In February 1999, Greene was promoted from Clinical Assistant in Psychology to Assistant in Psychology. Hence, even though there were only ten applications, Greene actually received eleven appointment letters.

acquire ownership of a mark: "Trademarks shall be owned by [MGH] if they . . . [3] pertain to significant Institutional Activities," defined as "any activities that received direct or indirect financial support from an Institution, including Institutional salary support or funding from any outside source awarded to or administered by an Institution."

## B. Procedural Background

In June 2009, Greene filed a complaint in federal district court alleging, inter alia, trademark infringement for MGH's use of the CPS Marks (Count X) and seeking, inter alia, a declaratory judgment as to Greene's ownership of the Marks (Count XII). With its answer, MGH filed a counterclaim seeking a declaratory judgment that MGH owns the CPS Marks (Count 4). MGH also sought an order that Greene's registration of "Collaborative Problem Solving Approach" on the USPTO supplemental register be revoked and that Greene's 2008 applications to register the CPS Marks on the principal register be denied. MGH moved for summary judgment on Counts X and XII of Greene's complaint and on Count 4 of the counterclaim.[7] The district court granted MGH's motion,

_____

[7] Greene submitted an affidavit with his opposition to the motion for summary judgment that became the subject of a motion to strike and a motion for sanctions. The district court granted and allowed these motions, respectively. As a result, portions of Greene's affidavit pertaining to an alleged oral agreement between Greene and MGH were stricken and Greene was precluded from relying on that agreement in his opposition to MGH's summary judgment motion. Greene explicitly does not appeal those decisions. Therefore, we will evaluate the summary judgment motion without

holding that Greene was subject to the IP policy and that, on two independent grounds, MGH owned the CPS Marks. First, under the 1995 and 2002 versions of the IP policy, the Marks were used to identify services associated with MGH, namely, the CPS Institute. Second, under the 2002 version of the IP policy, the Marks pertained to significant activities that received financial support from MGH as well as outside funding that MGH administered. Greene filed a timely appeal.

## C. Contract Defenses

Greene does not dispute that the IP policy was broad enough to encompass the CPS Marks. The long affiliation of the Marks with the Institute, and the Institute's financial relationship with MGH, were enough to bring the Marks within the IP policy's scope.[8] Rather, Greene raises a series of contract defenses, arguing that the employment agreements binding him to the IP policy were either voidable or unenforceable because of equitable estoppel, failure to reach a meeting of the minds, or

regard to the stricken passages.

[8] Greene argues that MGH waived any arguments predicated on the 1995 version of the IP policy; consequently, he argues, the district court erred when it held that he was subject to the 1995 policy from, at latest, his 1997 appointment renewal. Given Greene's admission that the 2002 Policy independently encompasses the Marks, we will assume, without deciding, that only the 2002 version applies. Thus, all references to "the IP policy" are references to the 2002 version. That assumption makes no difference to the outcome of this appeal.

unilateral mistake.   We address these issues in turn.[9]

## 1. Equitable Estoppel

Greene contends that MGH is equitably estopped from enforcing the IP policy.  Equitable estoppel is appropriate only where failure to apply estoppel would result in injustice.  Heckler v. Cmty. Health Servs., 467 U.S. 51, 59 (1984); Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Ct., 858 N.E.2d 699, 711 (Mass. 2006).  Under Massachusetts law,[10] an estoppel defense to a contract claim consists of: "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission."  Bongaards v. Millen, 793 N.E.2d 335, 339 (Mass. 2003).  "[T]he party asserting the estoppel theory has a heavy burden to prove that all [three] elements are present."  Sullivan,

---

[9] We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party.  Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 14 (1st Cir. 2004).

[10] The parties recognize, through multiple citations, that the contract claims in this case are governed by Massachusetts law. Further, as the record does not reveal a contrary choice of law provision in the bylaws, the IP policy, or Greene's employment contracts, we conclude that Massachusetts law must apply.  See Restatement (Second) of Conflict of Laws § 188(3) (1971) (explaining that, in the absence of a choice of law provision, "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied").

858 N.E.2d at 712 (quoting <u>Clickner</u> v. <u>City of Lowell</u>, 663 N.E.2d 852, 856 (Mass. 1996)) (internal quotation marks omitted).

Here, Greene's estoppel defense fails because he cannot establish the first element, "a representation intended to induce reliance." The representation underlying an estoppel defense need not be a verbal one: "conduct amounting to a representation" is sufficient. <u>Boylston Dev. Grp., Inc.</u> v. <u>22 Boylston St. Corp.</u>, 591 N.E.2d 157, 163 (Mass. 1992) (quoting <u>Cellucci</u> v. <u>Sun Oil Co.</u>, 320 N.E.2d 919, 923 (Mass. App. Ct. 1974)). Neither does the representation have to amount to "deceit, bad faith or actual fraud"; rather, the court looks for "conduct contrary to general principles of fair dealing." <u>Edwards</u> v. <u>Sullivan & Cogliano Cos., Inc.</u>, 2002 Mass. App. Div. 43, 43 (2002) (quoting <u>MacKeen</u> v. <u>Kasinskas</u>, 132 N.E.2d 732, 734 (Mass. 1956)). Greene argues that MGH represented that he owned the Marks by (1) behaving as if he owned the Marks, and (2) failing to disclose the IP policy.

**a. Behavior Suggesting Greene Owned the Marks**

To support his first contention, that MGH behaved as if he owned the CPS Marks, Greene points to three alleged facts: (1) MGH was aware of and endorsed his use of the Marks in unaffiliated enterprises; (2) MGH allowed the Center to share space with the Institute; and (3) MGH did not object when, in 2002, Greene registered one of the CPS Marks in his own name on the USPTO supplemental register. Drawing all reasonable inferences in

Greene's favor for summary judgment purposes, but mindful that Greene has the burden of proving his estoppel defense, we cannot find that any of this conduct amounted to a representation that Greene owned the CPS Marks.

Greene's participation in activities that took place outside of MGH, in which he nevertheless made use of the CPS Marks, was consistent with MGH's ownership of the Marks. Greene always, to MGH's knowledge, identified himself by his MGH affiliation. By identifying himself as an MGH affiliate, Greene rendered his uses harmonious with MGH's ownership of the Marks because Greene's self-identification with MGH served to identify the Marks with MGH as well. Also, Greene's own account of conversations he had with MGH about his external uses suggests that he sought MGH's approval to use the Marks in outside contexts.[11] These interactions are entirely consistent with MGH's position as owner because, even on Greene's telling of events, he used the Marks at MGH's pleasure.

Nor does MGH's acquiescence to Greene's use of the Marks in the names of his private corporations amount to a representation

---

[11] According to Greene, "he informed MGH as to how he was using the Marks to describe and brand his non-MGH activities and . . . the hospital representatives agreed to that use." Greene Br. 31 (emphasis added). Greene also writes that "MGH endorsed and supported [his use of the Marks]." Id. at 30 (emphasis added). Finally, Greene stated in his affidavit that he discussed his private use of the Marks with Dr. Rosenbaum during negotiations for the creation of the Institute, and Dr. Rosenbaum did not object to Greene's continued private use of the Marks. A. 2329 ¶ 32.

-13-

that Greene owned the Marks.[12]  These private corporations, the Clinic and the Center, shared physical space with the Institute but, unlike the Institute, were not formally affiliated with MGH. Use of the Marks in the names of both Greene's private corporations and the MGH-affiliated Institute would ordinarily suggest a common source for those services.  In one sense, that was entirely accurate, for Greene and Ablon were the principals in all three organizations.  Furthermore, even when used in Greene's private enterprises, the Marks represented the same service, namely, the methodology Greene developed.

But MGH, as owner of the Marks, would want to avoid confusion as to the source of CPS services whenever the Marks were used in a context not affiliated with MGH.  See Star Fin. Servs., Inc. v. AASTAR Mortg. Corp., 89 F.3d 5, 9 (1st Cir. 1996) ("The purpose of trademark laws is to prevent the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service.").  That is precisely what MGH did. In an email from its Office of General Counsel, MGH required Greene to make clear to the public that his private corporations were "not associated or affiliated with MGH in any way."  Thus, MGH both

---

[12] For Greene's use of the Marks in his private corporations to support his argument about MGH's representations, MGH would have to know that Greene was using the Marks in this manner.  The record supports the inference that MGH was, indeed, aware of this use of the Marks.  See A. 1542 (identifying Greene's private practice as the "CPS Clinic" in an email from Greene to the MGH Office of General Counsel).

allowed Greene to promote the CPS Approach and behaved in a manner consistent with the notion that the trademark ordinarily -- i.e., absent a disclaimer to the contrary -- stood for services associated with MGH. Such behavior falls far short of representing that Greene owned the Marks.

Greene's two remaining arguments pertaining to MGH's behavior are equally unavailing. First, while Greene points to the fact that his private corporation, the Center, shared space with the MGH-affiliated Institute, we fail to see how co-tenancy translates into a representation about ownership of the Marks. Second, although Greene argues that MGH did not object to his 2002 registration of a CPS service mark in his own name with the USPTO, Greene does not assert that MGH knew about that registration until this action began.[13] In his reply brief, he tries to shift the burden to MGH and accuses MGH of failing to cite any evidence in the record to show that it did not have knowledge of Greene's registration. But the burden to produce evidence of MGH's

---

[13] Greene also contends that the chief of the MGH Department of Psychiatry demanded that he "relinquish" the Marks. However, such a statement does not support Greene's estoppel defense because the alleged statement was not made until 2008, long after the Institute was founded and after Greene had signed every one of his employment agreements. By 2008, Greene had already ceded ownership of the Marks to MGH through years of affiliating the Marks with the Institute and using MGH's financial infrastructure. Consequently, even if we treated this statement as a representation about Greene's ownership, it would be impossible for Greene to show the necessary detrimental reliance.

-15-

knowledge, and thereby render MGH's failure to object meaningful, rests with Greene.

### b. Failure to Disclose the IP Policy

To support the notion that MGH's failure to disclose the IP policy amounted to a representation that Greene owned the Marks, Greene points to (1) MGH's exclusive knowledge of the IP policy; (2) the unfairness of enacting a policy mid-appointment that could result in an employee's unknowing loss of IP rights; and (3) the lack of a warning in his employment contracts that policies could change or may have changed since the last appointment, coupled with the similarity of language across his employment contracts. All of these arguments are grounded in Greene's assertion that he did not have actual knowledge of the IP policy until after he had unwittingly ceded his intellectual property rights to MGH by allowing the Marks to become affiliated with the Institute.

Extrinsic materials may be incorporated into a contract by reference as long as "the language used in the contract . . . clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." NSTAR Elec. Co. v. Dep't of Pub. Utils., 968 N.E.2d 895, 905 (Mass. 2012) (internal quotation marks omitted). "Unless incorporation by general reference is explicitly rejected by some statute or

-16-

regulation, incorporation by a clearly stated general reference will suffice." Chicopee Concrete Serv., Inc. v. Hart Eng'g Co., 498 N.E.2d 121, 122 (Mass. 1986).

Accordingly, a Massachusetts employer's policies may be incorporated by reference into its employment contracts. See Madonna v. Trs. of Univ. of Mass., 593 N.E.2d 1321, 1322 (Mass. App. Ct. 1992) (holding that an employer bound an employee to its personnel policy with the following language on the reverse side of an employment contract: "All employees of the University are employed pursuant to and subject to the polices and procedures of the Medical Center and the policies, rules and regulations adopted by the Board . . . as amended, revised, or repealed from time to time").

Here, the language in Greene's applications and appointment forms was sufficiently clear to incorporate the IP policy by reference. Greene signed and submitted three applications while the 2002 version of the IP policy was in effect: in October 2003, August 2005, and October 2007. Each application stated, "I have received and had an opportunity to read the Bylaws of the Medical/Professional Staff. I specifically agree to abide by all such bylaws and any policies and procedures that are applicable to appointees to the Medical/Professional Staff." Each application was accepted and Greene received, on each occasion, a Professional Staff Appointment Form stating, "In discharging the

duties and exercising the privileges of your appointment, you are required to . . . [a]bide by the Bylaws, rules, regulations, and policies of the Professional Staff and the Hospital."

Once it is acknowledged that at least three of Greene's employment contracts incorporated the IP policy as enacted in 2002, his arguments quickly fall away because of "[t]he general rule . . . that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not." Spritz v. Lishner, 243 N.E.2d 163, 164 (Mass. 1969) (quoting Cohen v. Santoianni, 112 N.E.2d 267, 271 (Mass. 1953)); see St. Fleur v. WPI Cable Sys./Mutron, 879 N.E.2d 27, 35 (Mass. 2008) (distinguishing Cohen because the plaintiff alleged fraud in the inducement); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 18, 21 n.17 (1st Cir. 1999) (stating, in a case in which the plaintiff signed a form incorporating "rules, constitutions, or by-laws," that "[i]f [the defendant] had provided the rules to [the plaintiff] but she did not read them, that would not save her [from having to abide by those rules]").

Greene argues that it is unfair to hold him to a policy enacted in the middle of one of his appointments. When the 2002 version of the IP policy was enacted, Greene was in the middle of an appointment that began in November 2001 and ended in November 2003. However, considering Greene's subsequent applications in October 2003 and August 2005 (the latter of which included explicit

reference to the IP policy), the fact that the IP policy was enacted mid-appointment is inconsequential.  As the district court reasoned, MGH's claim to the CPS Marks arose, inter alia, from the association of the Marks with MGH services, namely, the Institute. Greene allowed that association to continue even after he signed subsequent applications agreeing to abide by the IP policy.[14]

Finally, Greene complains that his employment contracts did not explicitly warn him that MGH might adopt new policies or modify existing policies.  The argument fails to appreciate that Greene's tenure at MGH was not one continuous period of employment. Rather, Greene enjoyed ten separate appointments, each governed by a separate agreement to be bound by the policies then in effect. Regardless of the facial similarity between contracts, Greene was required to read or assume the risk of not reading the policies incorporated afresh into each agreement.

In sum, since MGH's conduct did not amount to a representation that Greene owned the Marks, Greene's estoppel defense fails.

---

[14] This reasoning also applies to Greene's argument that the policy could not be applied "retroactively" to IP created before 2005.  Even if the policy did not apply until 2005, Greene nevertheless permitted the ongoing association of the Marks with the Institute.

## 2. Meeting of the Minds

Rehearsing similar arguments under a different heading, Greene argues that a valid contract was not formed at all because there was no "meeting of the minds." Since he did not know the IP policy existed, the argument goes, "Greene simply did not agree to be bound."

Although mutual assent is often misleadingly referred to as a "meeting of the minds," the formation of a valid contract under Massachusetts law requires objective, not subjective, intent. Nortek, Inc. v. Liberty Mut. Ins. Co., 843 N.E.2d 706, 713-14 (Mass. App. Ct. 2006). "A party's intent is deemed to be what a reasonable man in the position of the other party would conclude his objective manifestations to mean." CSX Transp. Inc. v. ABC & D Recycling, Inc., No. 11-30268-FDS, 2013 WL 3070770, at *5 (D. Mass. June 14, 2013). Assent may be inferred from conduct. Okerman v. VA Software Corp., 871 N.E.2d 1117, 1125 (Mass. App. Ct. 2007).

Here, notwithstanding Greene's assertions that he was unaware of the IP policy, he objectively manifested the intent to be bound by that policy when, without reservation, he signed the employment agreements that incorporated it by reference. See I & R Mech., Inc. v. Hazelton Mfg. Co., 817 N.E.2d 799, 802 (Mass. App. Ct. 2004) ("The manifestation of mutual assent between contracting parties generally consists of an offer by one and the acceptance of

-20-

it by the other."). Under these circumstances, there can be no doubt that Greene intended to be bound by his employment agreements in their totality. Separate evidence of Greene's assent to a particular provision (the incorporated IP policy) would be superfluous. Nevertheless, Greene provided precisely that additional evidence by signing the supplemental forms in 2005 and 2007. These forms, which Greene submitted with his final two employment applications, gave explicit notice of the IP policy and provided a URL address where the policy text could be accessed. Against the weight of such clear manifestations of objective intent, Greene's meeting of the minds defense cannot succeed.

### 3. Unilateral Mistake

Finally, Greene argues that, for the same reasons asserted above, his employment agreements are voidable under the doctrine of unilateral mistake. The district court held that Greene waived the unilateral mistake affirmative defense by failing to plead it in his answer to MGH's counterclaim. We find that the defense could not succeed even if it were not waived.

Unilateral mistake is a disfavored defense. See, e.g., Eck v. Godbout, 831 N.E.2d 296, 303 (Mass. 2005) ("A release may be rescinded or modified based on a mutual mistake of the parties, but not on one party's unilateral 'mistake' about how future contingencies might make the release inadvisable."); see also Restatement (Second) of Contracts § 153 cmt. a (1981) ("Courts have

-21-

traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as to a basic assumption, if the mistake was not shared by the other party."). Nevertheless, a contract may be avoided under Massachusetts law if the party asserting unilateral mistake does not bear the risk of the mistake and either (1) enforcing the agreement would be unconscionable or (2) the other party had reason to know of the mistake or his fault caused the mistake. Nissan Autos. of Marlborough, Inc. v. Glick, 816 N.E.2d 161, 166 (Mass. App. Ct. 2004) (citing Restatement (Second) of Contracts § 153). "A party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ." Restatement (Second) of Contracts § 154; accord Horney v. Westfield Gage Co., Inc., 77 Fed. App'x 24, 34 (1st Cir. 2003); Covich v. Chambers, 397 N.E.2d 1115, 1121 n.13 (Mass. App. Ct. 1979). In part due to the doctrine's origins in equity, courts have "considerable discretion" in matters of contractual mistake. O'Rourke v. Jason Inc., 978 F. Supp. 41, 47 (D. Mass. 1997).

Here, the mistake to which Greene refers is his misunderstanding about whether an IP policy existed and applied to the Marks. Greene's argument fails because he bore the risk of that mistake when he signed his employment contracts knowing that he had incomplete knowledge about the terms of those contracts.

-22-

All of his employment contracts clearly stated that he would be bound to MGH's "policies," yet he did not seek out or read those policies. Greene therefore "treat[ed] his limited knowledge as sufficient" and assumed the risk of mistake. Even if Greene did not bear the risk, we could not find it unconscionable to enforce the agreements under the circumstances. Nor could we find that MGH had reason to know Greene was unfamiliar with the IP policy, particularly considering that Greene explicitly acknowledged that policy in the 2005 and 2007 supplemental forms. The unilateral mistake defense, like Greene's other defenses, must fail.

Since all of Greene's contract-based defenses fail, the judgment for MGH is affirmed.

## II. The Copyright Dispute

### A. Factual Background

In 1998, Greene published The Explosive Child, a book explaining the CPS Approach for lay audiences. The book has been published in three subsequent editions and is uncontestedly Greene's solo work. Also in 1998, Greene met Ablon, a trainee in the MGH psychology internship program. As one of Ablon's supervisors, Greene became his mentor. Under Greene's mentorship, Ablon became interested in the CPS Approach and began assisting in its dissemination through workshops and speaking engagements.

In early 2002, Greene and Ablon wrote a prospectus for a new book, ultimately called Treating Explosive Kids: The

Collaborative Problem Solving Approach ("Treating Explosive Kids"). The prospectus acknowledged that the CPS Approach had first been articulated in Greene's prior work, The Explosive Child. In contrast to its predecessor, Treating Explosive Kids was to be co-authored by Greene and Ablon and written for an audience of mental health professionals. In April 2002, they signed a publishing contract with Guilford Publications, Inc. ("Guilford"), agreeing to complete the book by the end of 2002.

Both Greene and Ablon agree that, at the time they signed the publishing contract, they intended that Ablon would make substantive contributions to the book. They disagree, however, about the quantity and quality of Ablon's actual contributions. According to Ablon, he "submitted most if not all of the treatment vignettes" -- dialogues that appear on 145 pages of the 226-page book. Ablon also claims to have taken "the lead in writing Chapter 8, regarding implementation of CPS in therapeutic and restrictive facilities, which wound up being 25 pages long," to have written "significant parts of other portions of the book[,] and [to have] reviewed and made suggestions for many other sections."

Greene tells a different story. According to Greene, "After significant delay, Dr. Ablon, rather than delivering an acceptable manuscript, delivered to me an 'attempt' at only one chapter." Ablon's work was, in Greene's view, "poorly written, lacked focus, and did not accurately represent the [CPS Approach]."

-24-

Greene claims that, after consulting with the agent who had represented him and Ablon in their dealings with Guilford, he discarded "most" of Ablon's draft and wrote what amounted to almost the entire book himself. However, as Greene explains, "In an attempt to salvage for him some co-authorship role, we decided that he (Dr. Ablon) would contribute as original material some treatment vignettes describing some treatment interactions he had encountered." Greene calculates that Ablon's contributions survived on fewer than fifteen pages of the final published text. Both authors acknowledge that Greene edited the drafts.

Guilford published Treating Explosive Kids in October 2005. The book identifies Greene and Ablon as co-authors and as co-owners of the copyright. Greene and Ablon divide royalties from the book equally.

By 2007 or 2008, Greene and Ablon's relationship had soured, and efforts to improve their relationship through lawyers and a mediator proved ineffective. Ablon became a full-time employee at MGH at the end of 2008 and, soon after, was appointed Director of the Think:Kids program. In that capacity, Ablon has created written expression, including PowerPoint slides, that describe and promote the CPS Approach and which form part of the basis for this action. MGH terminated Greene's employment on January 15, 2009.

## B. Procedural Background

In his June 2009 complaint and in two subsequent amended complaints, Greene filed several claims against Ablon. He alleged that certain of Ablon's PowerPoint slides infringed on Greene's copyrights in The Explosive Child (Count I) and Treating Explosive Kids (Count II). Greene also sought an accounting for Ablon's use of Treating Explosive Kids (Count III), an injunction enjoining Ablon from continued infringement of The Explosive Child (Count XI), and a declaration of the intellectual property rights of the parties (Count XII).

Ablon moved for partial summary judgment. On September 17, 2012, the district court granted the motion in part and denied it in part. In particular, the district court held that Treating Explosive Kids was a joint work under the Copyright Act. However, the court stated that it could not resolve at summary judgment whether Treating Explosive Kids was also a derivative work because the record was "sufficiently open-ended to permit a rational factfinder to conclude either that Treating Explosive Kids is a derivative work based on The Explosive Child or that Treating Explosive Kids is not a derivative work."

At a status conference on December 4, 2012, the court asked counsel for both sides whether, as a legal matter, Treating Explosive Kids could be a derivative work in light of the court's earlier ruling that it was a joint work. Greene and Ablon

submitted simultaneous briefs on the issue nine days later. On January 9, 2013, at the final pretrial conference, the court again heard from both parties on the derivative work issue. Noting that it had gained greater clarity on the issue since the summary judgment motion, the district court ruled on a motion in limine that Treating Explosive Kids could not be both joint and derivative as a matter of law. Therefore, in light of its earlier ruling that the book was a joint work, the derivative work question would not go to the jury. The court then dismissed Count II of Greene's complaint, which alleged that Ablon's slides infringed on Treating Explosive Kids, because Ablon co-owned that book and could not infringe on it as a matter of law.

Count I of Greene's complaint -- that Ablon's PowerPoint slides infringed on Greene's solo work, The Explosive Child -- went to trial on January 14, 2013.[15] Greene contends that "a large portion" of the evidence he planned to present at trial was excluded because the court did not allow him to present expressions from Ablon's slides that were also found in Treating Explosive Kids.[16] Greene ultimately introduced six expressions from Ablon's

_____

[15] The court had issued its dissection analysis of The Explosive Child on December 4, 2012. Greene v. Ablon, 914 F. Supp. 2d 110 (D. Mass. 2012); see Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 608-09 (1st Cir. 1988) (explaining that the purpose of a dissection analysis is to identify the elements of a work that are protected by copyright).

[16] Greene argues he was prevented from presenting expressions from Ablon's slides that were the same as or similar to expressions

slides that did not also appear in <u>Treating Explosive Kids</u> and that allegedly infringed on <u>The Explosive Child</u>.

Trial lasted eight days. At the close of Greene's case, Ablon moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) and renewed his motion at the close of his own case, but the court denied his motions and let the jury decide the infringement claim.[17] The jury awarded Greene $19,000 in statutory damages.[18] Greene then moved for judgment on his remedial claims, which the parties had agreed would be submitted to the court after trial: an accounting of profits Ablon earned from his use of their joint work, <u>Treating Explosive Kids</u> (Count III); an injunction to prevent Ablon from infringing further on <u>The Explosive Child</u> (Count XI); and a declaration of the rights of the parties (Count XII). Meanwhile, Ablon renewed his motion for judgment as a matter of law, now under Federal Rule of Civil Procedure 50(b). The district court denied these motions and, on September 20, 2013, entered final judgment for Greene on Count I of his complaint and for Ablon on all other counts.

---

found in <u>Treating Explosive Kids</u>, although in fact the court only excluded expressions from the slides identical to those found in <u>Treating Explosive Kids</u>.

[17] The motion was granted in regard to claims not relevant here.

[18] Under 17 U.S.C. § 504(c)(1), a copyright owner may pursue actual damages or "may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages" between $750 and $30,000.

Greene appeals (1) the district court's summary judgment decision that <u>Treating Explosive Kids</u> is a joint work; (2) the court's ruling that <u>Treating Explosive Kids</u> is not a derivative work; and (3) the court's denial of his motions for an accounting and injunctive relief. Ablon appeals the court's denial of his renewed motion for judgment as a matter of law.

**C. Joint Work**

The district court held in its summary judgment ruling that <u>Treating Explosive Kids</u> is a joint work. Under the Copyright Act, a joint work is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "Inseparable" contributions "have little or no independent meaning standing alone," as might frequently be the case with collaboration on a written text like a play or a novel. <u>Childress</u> v. <u>Taylor</u>, 945 F.2d 500, 505 (2d Cir. 1991). "Interdependent" contributions, on the other hand, "have some meaning standing alone but achieve their primary significance because of their combined effect, as in the case of the words and music of a song." <u>Id.</u> For a work to be "joint," the authors must have intended, "at the time the writing is done," that their contributions be merged into "an integrated unit." <u>Id.</u> (emphasis omitted) (quoting H.R. Rep. No. 1476, at 120 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659, 5736). It is not necessary that the authors' contributions be quantitatively or

qualitatively equal, only that each author's contribution be more than de minimis.  1 Melville Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 6.07[A][1] (2014) ("<u>Nimmer</u>").

Authors who create a joint work co-own the copyright in that work.  17 U.S.C. § 201(a); <u>see</u> <u>also</u> <u>Saenger Org., Inc.</u> v. <u>Nationwide Ins. Licensing Assocs., Inc.</u>, 119 F.3d 55, 59 (1st Cir. 1997) (citing § 201(a) for the premise that "copyright protection generally attaches to the person [or persons] who actually create[ ] a work").  Joint authors share "equal undivided interests in the whole work -- in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint author for any profits that are made."  <u>Thomson</u> v. <u>Larson</u>, 147 F.3d 195, 199 (2d Cir. 1998).  Even if it is clear that one co-author has contributed more to the work than another co-author, they are nevertheless equal owners of the copyright in the absence of an agreement to the contrary. 1 <u>Nimmer</u> § 6.08.

Greene argues that it is a genuine issue of material fact whether he intended his contributions to merge with Ablon's into a unitary whole.  He concedes that the book, as originally conceived, would have been such an integrated work, but insists that his intention changed after seeing Ablon's early efforts.  At that point, Greene asserts, the initial project was aborted and reignited with different intentions: Ablon's contributions were to

be limited to a handful of stand-alone vignettes.  As noted, Greene calculates that Ablon's contributions ultimately comprised no more than fifteen pages of the final 226-page published manuscript.

Even accepting that Ablon contributed a scant fifteen pages of excisable vignettes, Greene's argument fails because he confuses the quality and quantity of Ablon's contributions with the relationship the authors intended those contributions would have to the rest of the book.  We agree with the district court that "there is no evidence that either Greene or Ablon believed that Treating Explosive Kids was anything other than a unitary book, and there is abundant evidence that Ablon's contributions to the book would be [i.e., proved to be and, more importantly, were intended to be] interdependent with Greene's contributions."  Greene v. Ablon, No. 09-10937-DJC, 2012 WL 4104792, at *11 (D. Mass. Sept. 17, 2012) (citations omitted).  Although Ablon's vignettes and Greene's surrounding passages may "have some meaning standing alone," the structure of the book -- vignettes nested in related text -- demonstrates that these contributions were undoubtedly intended to "achieve their primary significance because of their combined effect."  Childress, 945 F.2d at 505.  Furthermore, the prospectus, the publishing contract,[19] the copyright notice, and the book itself

_____

[19] Ablon argues that we need not engage in a copyright analysis to determine if he and Greene are co-owners of the book because the publishing contract establishes that relationship.  While the contract provides some evidence that Greene and Ablon intended to co-own the Treating Explosive Kids copyright -- as through the

all describe Greene and Ablon, without distinction, as co-authors of a single work.  Based on these facts, the only reasonable conclusion is that Ablon's contributions were always intended to be interdependent with Greene's.  Therefore, the district court correctly determined at summary judgment that Treating Explosive Kids is a joint work, meaning that Greene and Ablon jointly own the copyright in that work.

**D. Derivative Work**

Although in its summary judgment ruling the district court held that it was a genuine issue of material fact whether Treating Explosive Kids is a derivative work, the court modified its ruling shortly before trial.  Accepting Ablon's argument that the book could not be both a joint work and a derivative work as a matter of law, and seeing no reason to disturb its earlier decision that Treating Explosive Kids was a joint work, the court ruled on

---

publisher's (unkept) promise to register the copyright "in the author's names [sic]" -- the contract itself only concerns the relationship between the authors and the publisher, not the relationship between Greene and Ablon.  For example, the contract details how royalties are to be divided between the publisher on one hand and the authors on the other, but not how the authors are to divide royalties.  While one may infer from the contract that Greene and Ablon equally co-own the copyright, the joint work analysis unequivocally establishes that fact.  Furthermore, the parties contest whether Treating Explosive Kids can be both joint and derivative as a matter of copyright law. Addressing the joint work question is a necessary predicate to that discussion.  See infra Section II(D).

a motion in limine that the book could not be a derivative work as a matter of law.[20]

Greene argues that this ruling was erroneous and improperly circumscribed his case. He asserts that, if the derivative work question had gone to the jury, he would have sought to introduce into evidence an additional two dozen expressions showing that Ablon's PowerPoint slides infringed on expression that he alone owned in both books. Although Greene is correct that the district court's ruling was erroneous -- a work can be both joint and derivative -- he misunderstands the consequences of that error and has not shown that it affected the trial.

A derivative work is "a work based upon one or more preexisting works." 17 U.S.C. § 101. It "consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work." Mass. Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 64-65 (1st Cir. 2010) (quoting 1 Nimmer § 3.03[A]). Importantly, "[t]he copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work . . . ." 17 U.S.C. § 103(b). With respect to that preexisting work, "[a]ny elements

---

[20] Greene objects to the court modifying its summary judgment ruling on a motion in limine. Because we find the district court's legal conclusion erroneous in any event, we need not reach this procedural issue.

that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights in the underlying work." Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1112 (1st Cir. 1993).

Greene maintains that, when a derivative work is created jointly, each co-author owns only the contributions he or she personally penned. However, nothing about the limited scope of a derivative work copyright upsets the ownership regime that normally arises when more than one author contributes to a work. When the authors of a derivative work are joint authors, they share equally in the copyright to the derivative work, regardless of who penned the new material. See 17 U.S.C. § 201(a). Thus, Greene has no greater claim than Ablon to any of the original expression in Treating Explosive Kids, and he cannot claim copyright infringement on the basis of Ablon's use of that original expression in his PowerPoint slides.

We do have the fact here that an author of the joint work, Treating Explosive Kids, is also the author of the relevant preexisting work, The Explosive Child. However, that coincidence does not affect the contours of the Treating Explosive Kids copyright, nor does it upset the joint ownership arrangement described above. Treating Explosive Kids may be both joint and derivative, with Greene alone owning the copyright in the

-34-

underlying work -- The Explosive Child -- and co-owning the copyright in the derivative work with Ablon.[21]

Hence, Greene might have a viable infringement claim against Ablon if Ablon created a derivative of Treating Explosive Kids, such as the slides, that used the non-original material in Treating Explosive Kids -- i.e., material derived from The Explosive Child and covered by Greene's copyright in that work. Consequently, Greene should have been allowed to introduce into evidence slides with expression drawn verbatim from Treating Explosive Kids. He could have used that expression to argue to the jury both that Treating Explosive Kids is a derivative work based on The Explosive Child and, relatedly, that Ablon drew on expression from Treating Explosive Kids that the co-owned Treating Explosive Kids copyright did not encompass. See, e.g., Oddo v. Ries, 743 F.2d 630, 634 (9th Cir. 1984) (holding that the co-owner of a derivative work infringes on the other co-owner's preexisting work when he uses it without permission in a subsequent work, notwithstanding that the preexisting work was used in the co-owned

_____

[21] Professor Nimmer provides another example of how a work may be both joint and derivative. He posits a screenplay based on a novel. "[The] screenplay is a derivative work of the novel on which it is based. Let us imagine that [two writers] work together to translate the [novel] to the silver screen. Their resulting screenplay, as between themselves, is a joint work. Nonetheless, vis-a-vis the novel, their screenplay is a derivative work. One and the same production thus can occupy both statuses." 1 Nimmer § 6.05 (emphasis omitted). In that example, the screenplay writers co-own the screenplay copyright, which does not include expression from the preexisting novel.

-35-

derivative); see also Danjaq LLC v. Sony Corp., No. CV97-8414-ER(Mcx), 1998 WL 957053, at *3 (C.D. Cal. Jul. 29, 1998) ("[T]he owner of the copyright in the original work may sue the author(s) of a joint-derivative work who make further derivative works which employ pre-existing material from the original work without the permission of the owner of the original work."). Instead, the court only allowed Greene to introduce into evidence slides with expression that did not appear verbatim in Treating Explosive Kids, on the theory that only those slides would support an argument that Ablon had infringed Greene's copyright in The Explosive Child.

On the record before us, however, we are unable to assess whether the district court's erroneous conclusion harmed Greene in any way. Greene failed to make an offer of proof of the alleged two dozen additional expressions that he claims he would have sought to introduce at trial if the court had allowed the jury to determine whether Treating Explosive Kids is a derivative work. See Fed. R. Evid. 103(a)(2) (requiring an offer of proof); Faigin v. Kelly, 184 F.3d 67, 86 (1st Cir. 1999) ("[I]t is a bedrock rule of trial practice that, to preserve for appellate review a claim of error premised on the exclusion of evidence, the aggrieved party must ensure that the record sufficiently reflects the content of the proposed evidence." (internal quotation marks omitted)). Only one expression -- referred to at trial as the "conventional wisdom" expression -- was excluded with the necessary offer of proof.

However, the court excluded that expression in part because it was not subject to copyright protection, and Greene has not argued that the district court's analysis on that point was erroneous.  Despite numerous opportunities to do so, including his opposition to the motion in limine, the final pretrial conference, and the trial, Greene has not identified any of the two dozen expressions he allegedly would have sought to introduce but for the court's ruling.[22]  Since Greene has not developed a record to show that he has been harmed, we decline to remand for further proceedings.

## E. Accounting

Apart from the infringement claim based on Ablon's unlawful use of expression from The Explosive Child, Greene sought an accounting from Ablon for Ablon's use of their joint work, Treating Explosive Kids.  According to Greene, Ablon earned profits from activities that used expression taken from Treating Explosive Kids and, since they co-owned the copyright to that work, Ablon was obligated to share the profits with Greene.  The parties agreed that the accounting claim would be submitted to the court instead of to the jury.  After the infringement trial, Greene moved for judgment on his accounting claim.  The court denied the motion because Greene had not presented any evidence that Ablon had

---

[22] Neither has Greene identified these expressions on appeal. We are not suggesting, however, that such an offer of proof would have been timely.

actually received any profits from his use of their joint work. Hence, there was nothing for which to account.

A co-owner "must account to other co-owners for any profits he earns from licensing or use of the copyright." Oddo, 743 F.2d at 633. The duty to account "comes from 'equitable doctrines relating to unjust enrichment and general principles of law governing the rights of co-owners.'" Id. (quoting Harrington v. Mure, 186 F. Supp. 655, 657-58 (S.D.N.Y. 1960)); see Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG., 510 F.3d 77, 98 (1st Cir. 2007); Goodman v. Lee, 78 F.3d 1007, 1012 (5th Cir. 1996); Ashton-Tate Corp. v. Ross, 916 F.2d 516, 522 (9th Cir. 1990).

As discussed in Section II(C), Treating Explosive Kids is a joint work. Therefore, Greene and Ablon co-own the copyright to that work. Greene argues that Ablon owes him an accounting for having exploited Treating Explosive Kids in two contexts. First, as director of MGH's Think:Kids enterprise, Ablon allegedly used expression from Treating Explosive Kids in MGH programs, advertising, and fundraising efforts, as well as in the treatment of clients and in the training of clinicians, yielding "large sums of revenue" for MGH in the form of donations and fees.[23] Second,

---

[23] In his motion, Greene did not cite any specific uses of the copyrighted material to the district court. On appeal, he cites thirty-seven pages in the record reproducing a Think:Kids slide presentation and several Think:Kids handouts. He does not, however, identify which particular passages in these thirty-seven

Ablon allegedly earned revenue for himself by using material from Treating Explosive Kids in talks he gave outside of MGH.[24]

### 1. MGH Revenue

The district court rejected Greene's first theory because, as a matter of law, Ablon could not be called to account for MGH's profits. The court correctly held that "donations and fees to MGH are not subject to an accounting as to Ablon's profits." Greene v. Ablon, No. 09-10937-DJC, 2013 WL 4714344, at *5 (D. Mass. Aug. 28, 2013). As Greene concedes, an accounting can only be sought from a co-owner, not the co-owner's licensee, see 1 Nimmer § 6.12[B], and MGH is not a co-owner of the copyright in this case.

Still, Greene argues, even if Ablon did not himself earn revenue from allowing MGH to use the copyright (impliedly licensing the copyright to MGH), MGH's financial gain shows that the copyright had value, and Ablon must account to him for that value.

_____

pages are allegedly drawn from Treating Explosive Kids, nor whether these pages encompass some of the same slides disputed at trial. Nor does Greene explain which passages from Treating Explosive Kids appear in the Think:Kids materials. Use, of course, must precede an accounting for use. But since Ablon does not contest that he used the Treating Explosive Kids materials in the manner Greene asserts, we will accept that material from Treating Explosive Kids was used in the materials Greene cites.

[24] Below, Greene also argued a third context: that Ablon's salary at MGH was based in part on the exploitation of Treating Explosive Kids. The district court declined to speculate on what proportion of Ablon's salary, if any, was tied to the Treating Explosive Kids copyright. Greene has not revived that argument on appeal.

In this argument, Greene is pressing the depletion theory of copyright accounting, which supposes that one co-owner's use of the work necessarily reduces the residual value available for other co-owners to exploit.  See 1 Nimmer § 6.12[A].  This lost value, the theory goes, is what justifies the accounting.  Id.  In effect, Greene argues that a party's duty to account for profits earned is really a duty to account for value lost.

We acknowledge the theoretical appeal of the notion that if one owner permits free use of the copyright, that owner incurs a debt to his co-owner because the use, paid-for or not, partially depletes the value of the copyright.  However, the duty to account is for profits, not value.  See Cambridge Literary Props., Ltd., 510 F.3d at 84 (discussing an "accounting for profits by a co-owner of a copyright"); Goodman, 78 F.3d at 1012 ("It is widely recognized that '[a] co-owner of a copyright must account to other co-owners for any profits he earns from the licensing or use of the copyright . . . .'" (quoting Oddo, 743 F.2d at 633)); Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir. 1989) ("The only duty joint owners have with respect to their joint work is to account for profits from its use."); see also Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 571 (2d Cir. 1955), modified, 223 F.2d 252 (2d Cir. 1955) (holding that the defendant was "entitled to an accounting . . . of the proceeds received from the exploitation of the copyright" (emphasis added)); Picture Music,

Inc. v. Bourne, Inc., 314 F. Supp. 640, 646-47 (S.D.N.Y. 1970) (referring to a duty to account for "compensation"). Indeed, Congress itself referred to "profits" as the subject of a co-owner's duty to account. See H.R. Rep. No. 94-1476, at 121 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5736 (describing co-owners of a copyright "as tenants in common, with each co[-]owner having an independent right to use or license the use of a work, subject to a duty of accounting to the other co[-]owners for any profits").[25] Since Ablon can be called to account only for profits earned, not value lost, the district court correctly held that MGH's alleged financial gain was irrelevant to Ablon's duty to account.

### 2. Ablon's Revenue

In his motion for an accounting, Greene referred generally to the "evidence at trial" to support his contention that Ablon "engaged in speaking programs outside of MGH for which he was likely compensated." The district court rejected this argument, stating, "Greene does not identify the evidence that would tie the Treating Explosive Kids copyright to compensation that Ablon was 'likely' to have received." Greene, 2013 WL 4714344, at *5. We agree that the record does not support this claim. Even if Ablon were compensated for these speaking engagements, Greene has not

---

[25] We note that Congress knew well how to speak of value instead of profits, as in the fourth fair use factor: "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

provided evidence that Ablon's compensation would have been tied to his use of expression from Treating Explosive Kids as opposed to, for example, the underlying ideas. See 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . ."); Golan v. Holder, 132 S. Ct. 873, 890 (2012) (explaining the "idea/expression dichotomy" and describing it as one of two "'traditional contours' of copyright protection" (quoting Eldred v. Ashcroft, 537 U.S. 186, 221 (2003))).[26]

## F. Injunction

Having secured a verdict that Ablon infringed on The Explosive Child with his PowerPoint slides, Greene sought an injunction to prevent Ablon from infringing on The Explosive Child again in the future. Like the accounting claim discussed above, the request for injunctive relief was submitted to the district court on a motion after trial. The district court denied the

---

[26] Greene also appeals the district court's decision not to grant additional limited discovery in aid of judgment, i.e., in aid of the accounting Greene sought. As the court wrote, "[t]he parties went through extensive discovery lasting almost one year . . . . Greene still is not able to point to any evidence that Ablon has profited from exploiting his copyright in Treating Explosive Kids." Greene, 2013 WL 4714344, at *5. The court did "not see how additional discovery would do anything more than increase the cost of litigation to both sides." Id. We agree.

motion.[27]  We review the decision to grant or deny permanent injunctive relief for abuse of discretion.  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

The Copyright Act authorizes courts to grant injunctive relief for copyright infringement.  17 U.S.C. § 502(a).  "A plaintiff seeking a permanent injunction is traditionally required to satisfy a four-factor test: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008) (quoting eBay Inc., 547 U.S. at 391).  An injunction should not be granted where "a less drastic remedy" will suffice.  Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66 (2010).

Greene argues that the court abused its discretion by failing to credit the possibility that Ablon would continue to infringe on The Explosive Child in the future.  Greene's prediction rests on an allegation that Ablon continued to infringe even after Greene filed his complaint.  The district court reasoned that Ablon's infringing activities could not "reasonably be expected to

---

[27] Greene also sought declaratory relief, which the court also denied.  Greene does not challenge that ruling on appeal.

continue, where the infringement found by the jury was limited to a finite set of presentation slides that can easily be changed . . . and where the benefit to Ablon in using this material is likely far outweighed by the costs of responding to a future lawsuit." Greene, 2013 WL 4714344, at *7.

Greene also argues that the court mistakenly determined that his injury was sufficiently addressed by the jury's damages award. He specifies that the jury award did not and could not sufficiently compensate him for the "loss of quality control over the dissemination of his model nationwide." The district court reasoned that the jury award was adequate because $19,000 is situated comfortably in the statutory range of $750 to $30,000, suggesting the jury did not feel constrained by the statutory cap. See id. at *7.

We detect no abuse of discretion in the court's reasoning and will not upset its decision to deny the injunction. To the extent Greene bases his argument on the loss of quality control over his method, copyright law does not give the author control over a method described in a written work; only control over the written work itself. See 17 U.S.C. § 102(b) (stating that copyright protection does not extend to ideas).

## G. Cross-Appeal

Ablon challenges the district court's denial of his post-verdict, Rule 50(b) motion for judgment as a matter of law. We

review the denial of a Rule 50(b) motion de novo.  Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 9 (1st Cir. 1999).

At trial, Greene tried to prove that Ablon's PowerPoint slides infringed on The Explosive Child, a work Greene wrote and owned alone.  Greene presented six expressions from The Explosive Child ("expressions one through six") and juxtaposed them with allegedly infringing expressions from Ablon's slides ("slides one through six").  The jury found that Ablon had indeed infringed on Greene's copyright, although the special verdict form did not allow the jury to specify which of the six expressions from The Explosive Child were infringed.

Ablon attempts to undermine the verdict by showing that his slides could not have infringed on any of the six expressions from The Explosive Child.  His argument unfolds in three parts. First, Ablon argues that slides one through four are probatively similar to a work he co-owns, Treating Explosive Kids, and so those expressions could not have infringed on The Explosive Child as a matter of law.  Second, he argues that slides two, four, and five are not probatively similar to, and therefore do not infringe on, The Explosive Child.  Finally, Ablon argues that expressions three, five, and six from The Explosive Child are not protected by copyright law.  We address each argument in turn.

## 1. Similarity to Treating Explosive Kids

Ablon argues that his co-ownership of Treating Explosive Kids means that certain of the challenged slides should have been found non-infringing as a matter of law and excluded from evidence at trial. The court refused to admit evidence of expression from Ablon's slides that was reproduced verbatim from Treating Explosive Kids. However, the court allowed Greene to introduce evidence from the slides that was "similar to" expression found in the joint work, including slides one through four, and allowed the jury to decide whether those slides infringed on Greene's solely owned work, The Explosive Child.

Ablon's argument, in effect, is that he was entitled to judgment as a matter of law on slides one through four because he has a right, as co-owner of Treating Explosive Kids, not only to take verbatim expressions from that book, but also to create "probatively similar" works.[28] In other words, he sees his slides as derivative works vis-a-vis Treating Explosive Kids and, as co-owner of that book, he claims a right to create such derivatives.

_____

[28] Greene argues that Ablon's use of "probative similarity" is misplaced, and that "substantial similarity" is the proper metric in this context. The dispute is immaterial. The difference between the two terms lies in their respective roles in the copyright infringement analysis. See T-Peg, Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 108, 111 (1st Cir. 2006) (explaining that "substantial similarity" is used to evaluate "copying," and "probative similarity" is used to show "actual copying" indirectly). However, Ablon's argument does not require us to differentiate between particular stages of the copyright infringement analysis.

Ablon is certainly correct that the co-owner of a joint work has a right to create derivative works, such as PowerPoint slides, subject to the accounting rights of his co-owner. However, he misunderstands the nature of derivative works. A derivative work is simply an infringing work made non-infringing through the acquisition of permission to use the underlying preexisting expression. See TMTV, Corp. v. Mass Prods., Inc., 645 F.3d 464, 471 (1st Cir. 2011) (characterizing an infringing work as "an unauthorized derivative work"); see also 1 Nimmer § 3.01 (explaining that "a work will be considered a derivative work only if[, but for permission to use the underlying work,] it would be considered an infringing work"). When a work derives from multiple preexisting sources, it is not sufficient for the author to obtain permission to use expression from one preexisting source but not the others.

Here, Ablon ignores the possibility that his slides may be derivative of both Treating Explosive Kids and The Explosive Child. Although he had a right to make derivative works of the former, he had no rights in the latter.[29] Hence, the fact that Ablon's slides may have derived from Treating Explosive Kids is not sufficient to prove, as a matter of law, that the slides did not

_____

[29] Even if Treating Explosive Kids is itself a derivative work, whatever permission Ablon would have had to use expression from The Explosive Child in the joint-derivative work would not have extended to further derivative works, like the slides. See, e.g., Oddo, 743 F.2d at 633-34.

infringe on The Explosive Child.  Accordingly, the district court correctly denied judgment as a matter of law with respect to slides one through four and properly admitted them into evidence.

### 2. Similarity to **The Explosive Child**

Ablon also argues that slides two, four, and five were not sufficiently similar to expression in The Explosive Child for a reasonable jury to have found infringement.[30]  In our de novo review of the district court's decision to deny Ablon's Rule 50(b) motion, we will not reverse the lower court "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment."  Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994) (quoting PH Group Ltd. v. Birch, 985 F.2d 649, 653 (1st Cir. 1993)).

In evaluating whether Ablon's slides and the relevant passages from The Explosive Child were substantially similar, the jury had to apply the "ordinary observer" test.  "Under that test, two works will be said to be substantially similar if a reasonable, ordinary observer, upon examination of the two works, would 'conclude that the defendant unlawfully appropriated the plaintiff's protectable expression.'"  T-Peg, Inc. v. Vt. Timber

---

[30] Here, again, Ablon speaks of probative similarity. However, since Ablon is contesting the jury's ultimate infringement findings, the proper metric of similarity in this context is substantial similarity.  See T-Peg, Inc., 459 F.3d at 108 (explaining the copyright infringement framework).

Works, Inc., 459 F.3d 97, 112 (1st Cir. 2006) (quoting <u>Johnson</u> v.

<u>Gordon</u>, 409 F.3d 12, 18 (1st Cir. 2005)).

To be sure, some differences in language exist between slides two, four, and five and the related passages in <u>The Explosive Child</u>.[31]  In each pair of expressions, however, key words or phrases overlap such that a reasonable jury could have concluded that the later expression was a minimally revised version of the earlier work and not an original articulation of a common idea. <u>Segrets, Inc.</u> v. <u>Gillman Knitwear Co.</u>, 207 F.3d 56, 65 (1st Cir. 2000) ("Slight or trivial variations between works will not

---

[31] The slides and passages in question are as follows:

Slide two ("Reward and punishment programs can teach basic lessons but weren't ever intended to teach complicated skills.") and this expression from <u>The Explosive Child</u>: "First, notice that all the categories end with the same word: skills.  Pathways can best be thought of as skills that need to be trained.  Second, reward and punishment programs don't train the child in any of the skills."  (In his brief, Ablon misquotes the slide, replacing "programs" with "systems".)

Slide four ("Rather, challenging behavior -- including explosions, implosions and everything else in between -- occurs when a demand placed upon someone requires skills to handle the demand in an adaptive manner that person does not fully possess.") and this expression from <u>The Explosive Child</u>: "An explosive outburst -- like other forms of maladaptive behavior -- occurs when the cognitive demands being placed upon a person outstrip that person's capacity to respond adaptively."  (In his brief, Ablon misquotes the slide, adding "the" before "person".)

Slide five ("The child has shown he needs someone to serve as his 'tour guide' for navigating problems and regulating emotions.") and this expression from <u>The Explosive Child</u>: "That is, you're going to be doing the thinking for your child that he's currently incapable of thinking on his own; you're going to serve as his tour guide through frustration."  (In his brief, Ablon misquotes <u>The Explosive Child</u>, omitting "doing the", turning the semicolon into a period, and changing "serve as his" to "serves as a".)

preclude a finding of infringement under the ordinary observer test." (quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 608 (1st Cir. 1988))). Given the equivalence in language between these portions of the two works, we cannot say that a reasonable jury was foreclosed from finding that slides two, four, and five were "substantially similar" to Greene's correlative expression in The Explosive Child. Hence, the district court did not err in denying Ablon's motion for judgment as a matter of law with respect to those slides.

## 3. Availability of Copyright Protection

In his final argument, Ablon contends that expressions three, five, and six from The Explosive Child are not subject to copyright, and therefore the court should not have admitted them into evidence. We take these expressions in turn, reviewing de novo the district court's assessments of copyrightability. Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 51 (1st Cir. 2012).

First, Ablon argues that expression three from The Explosive Child is not sufficiently original to merit copyright protection. Greene's book posits that, "[a]s children develop, they learn that . . . most things in life are 'gray,'" and he describes certain children as "black and white thinkers stuck in a gray world." As the district court explained, "[h]ere the idea is that explosive children suffer from an inflexibility of

-50-

thought . . . . This idea could be expressed in many ways . . . ." Greene v. Ablon, 914 F. Supp. 2d 110, 119 (D. Mass. 2012).

In arguing that Greene's expression is not sufficiently original, Ablon isolates the words "gray" and "black and white thinkers" from the larger expression, and observes that Greene is far from the first to employ these phrases to contrast ambiguity and precision. True as that may be, the standard for originality in copyright is low. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 346, 362-63 (1991) (explaining that the originality requirement demands only "a modicum of creativity"). Importantly, the question here is not whether Greene has a copyright in those words taken in isolation, but whether their use in the particular context is protected. See Soc'y of Holy Transfiguration Monastery, 689 F.3d at 52 n.18 (citing Salinger v. Random House, Inc., 811 F.2d 90, 98 (2d Cir. 1987), for the proposition that "although ordinary phrases might not be copyrightable, their 'use in a sequence of expressive words does not cause the entire passage to lose protection'"). We agree with the district court that Greene's use of the black/white/gray imagery to describe a characteristic of the "explosive child" satisfies the low threshold of originality required to earn copyright protection.

Ablon similarly argues that expression five from The Explosive Child is not original and therefore not subject to

-51-

copyright protection.[32]  Here, the relevant phrase from Greene's

work is: "you're going to serve as [your child's] tour guide

through frustration."  Ablon focuses on the words "tour guide,"

contending that they are the only overlap with his slide, which

reads, "The child has shown he needs someone to serve as his 'tour

guide' for navigating problems and regulating emotions."  Greene's

decision to use "tour guide" in this context as a shorthand for a

parent's role in a child's emotional journey through difficult

episodes easily passes the threshold of creativity the law

requires.  Again, the protected expression at issue is not, as

Ablon avers, the words "tour guide" alone; rather it is the phrase

in which those words are contained.  We agree with the district

court that, considered as a whole, that phrase meets the

originality requirement.

Finally, Ablon concedes that he copied slide six --

"[y]our explanation guides your intervention" -- verbatim from The

Explosive Child, but argues that Greene's expression is not subject

---

[32] Ablon also asserts that expression five is subject to the
merger doctrine.  See Yankee Candle Co. v. Bridgewater Candle Co.,
259 F.3d 25, 35-36 (1st Cir. 2001) (explaining that, under the
merger doctrine, copyright protection is not available for
expression when the underlying idea can only be expressed one way).
We need not consider merger: Ablon's argument on this point
consists wholly of a bare assertion that merger applies.  That
argument is therefore waived.  See Alicea v. Machete Music, 744
F.3d 773, 780 (1st Cir. 2014) ("[I]ssues adverted to in a
perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived." (quoting United States v.
Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).

to copyright because it is a short phrase.  Ablon is correct that, as a general matter, certain kinds of short phrases are excluded from copyright protection.  The Copyright Office has specified that "[w]ords and short phrases such as names, titles, and slogans" are not subject to copyright.  37 C.F.R. § 202.1(a).  However, "much turns on the specific short phrases at issue, as not all short phrases will automatically be deemed uncopyrightable."  Soc'y of Holy Transfiguration Monastery, 689 F.3d at 51-52; see 1 Nimmer § 2.01[B] ("[E]ven a short phrase may command copyright protection if it exhibits sufficient creativity.").

As the district court explained, "[a]lthough the phrase 'your explanation guides your intervention' may not seem like a novel expression, such is not required for copyright protection." Greene, 914 F. Supp. 2d at 120.  Greene uses this short, punchy statement to summarize a method for handling explosive children. Indeed, the creativity of the phrase is due in part to its succinct articulation of a complex concept.  We agree with the district court that, in context, the phrase is substantial and creative enough to warrant copyright protection.  Cf. Hutchins v. Zoll Med. Corp., 492 F.3d 1377, 1385 (Fed. Cir. 2007) (holding "stay calm," "if no pulse, start CPR," and "give two breaths" were each "fragmentary phrases" not subject to copyright); Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 542 (6th Cir. 2004) (comparing a short computer program of sufficient

creativity to other "spare, simple, but creative" expressions, like the poetry of e.e. cummings); <u>CMM Cable Rep, Inc.</u> v. <u>Ocean Coast Props., Inc.</u>, 97 F.3d 1504, 1520 (1st Cir. 1996) (holding "call in, clock in, and win" is an unprotectable slogan); <u>Arvelo</u> v. <u>Am. Int'l Ins. Co.</u>, 66 F.3d 306, 306 (1st Cir. 1995) (holding, in an unpublished opinion, that the name "Retail Plus" is not subject to copyright).[33]

## III.

For the foregoing reasons, in the trademark dispute, the district court ruled correctly that none of Greene's defenses to the enforcement of his employment contracts with MGH succeed. In the copyright dispute, we agree with the district court that <u>Treating Explosive Kids</u> is a joint work. Although the district court erroneously concluded that <u>Treating Explosive Kids</u> cannot be simultaneously joint and derivative, Greene failed to make an offer of proof demonstrating that any harm resulted from the court's

---

[33] Ablon argues in the alternative that the copying in slide six was de minimis. However, "[t]hat the copying involved only a small portion of the plaintiff's work does not by itself make the copying permissible. Indeed, even if the similar material is quantitatively small, if it is qualitatively important, the trier of fact may properly find substantial similarity. As a result, de minimis copying is best viewed not as a separate defense to copyright infringement but rather as a statement regarding the strength of the plaintiff's proof of substantial similarity." <u>Situation Mgmt. Sys., Inc.</u> v. <u>ASP. Consulting LLC</u>, 560 F.3d 53, 59 (1st Cir. 2009) (citation omitted) (internal quotation marks omitted). Here, the originality of the phrase, coupled with evidence that Ablon copied other portions of <u>The Explosive Child</u>, as well, are sufficient to overcome the de minimis defense.

ruling. The district court properly determined that Greene is not entitled to an accounting or an injunction. Finally, the district court properly denied Ablon's motion for judgment as a matter of law under Rule 50(b).

<u>Affirmed.</u> Each party shall bear its own costs.