NORTEK, INC. & another[1] vs. LIBERTY MUTUAL INSURANCE
COMPANY.

No. 05-P-200.

Suffolk. January 9, 2006. - March 15, 2006.

Present: RAPOZA, GREEN, & KATZMANN, JJ.

*Limitations, Statute of. Contract,* Performance and breach, Implied covenant
of good faith and fair dealing. *Insurance,* Premiums. *Conversion. Practice,
Civil,* Offer of judgment, Statute of limitations, Relief from judgment.
*Judgment,* Relief from judgment.

In a civil action concerning the obligation of the plaintiffs (a parent corpora-
tion and its subsidiary) to pay retrospective premiums on insurance poli-
cies issued by the defendant, a Superior Court judge erred in dismissing
the plaintiffs' breach of contract claim on the ground of the statute of
limitations, where the cause of action accrued, at the earliest, when the
defendant unequivocally and finally rejected the subsidiary plaintiff's posi-
tion on the proper method for allocation of losses and computation of
retrospective premiums, and the complaint was filed well within six years
of that event [768-770]; likewise, the plaintiffs' claim under G. L. c. 93A,
§ 11, was not time-barred by the applicable four-year limitations period
[770], and the subsidiary plaintiff's conversion claim fell comfortably
within the applicable three-year limitations period [770-771].
In a civil action concerning the obligation of the plaintiffs to pay retrospective
premiums on insurance policies issued by the defendant, in which the
defendant counterclaimed for recovery of certain monies, the judge
properly concluded that the plaintiffs were bound by an agreement for
judgment entered into pursuant to Mass.R.Civ.P. 68 as to the defendant's
counterclaim, despite the plaintiffs' allegation of a mistake in their offer of
judgment justifying relief from judgment pursuant to Mass.R.Civ.P. 60(b),
where such relief was not warranted in the circumstances. [771-775]

CIVIL ACTION commenced in the Superior Court Department on
September 25, 2002.

The case was heard by *Allan van Gestel,* J., on a motion for
summary judgment, and postjudgment motions for relief were
also heard by him.

[1]MPDC, Inc.

*John M. Edwards* (*Joshua C. Rowland* with him) for the plaintiffs.

*Daniel P. Tighe* (*Sara Jane Shanahan* with him) for the defendant.

Green, J. The plaintiffs, MPDC, Inc. and its parent corporation, Nortek, Inc., appeal from a judgment dismissing their complaint and awarding damages on the defendant's counterclaim, and an order denying their postjudgment motions for relief from the judgment. The underlying dispute concerns the plaintiffs' obligations to pay retrospective premiums on certain insurance policies issued by the defendant. A judge of the Superior Court concluded that the plaintiffs were bound by the terms of an agreement for judgment as to the defendant's counterclaim, and that the plaintiffs' affirmative claims were time-barred. We affirm the judgment on the defendant's counterclaim, but reverse so much of the judgment as dismissed the plaintiffs' affirmative claims.

*Background.*[2] From 1976 through 1988, defendant Liberty Mutual Insurance Company (Liberty) issued to Nortek (and Monogram Industries, Inc., a predecessor to MPDC) commercial general liability insurance policies naming American Pneumatic Tool Company (APT) as an insured. The policies furnished coverage on a so-called "occurrence basis," so that the policies insured losses (subject to the policy limits) arising during any period in which each policy was in place, even if such losses were not realized until after the end of the policy period. The policies also provided for payment of annual premiums based upon (among other things) actual loss experience. Accordingly, as and when losses were realized by an insured, and paid by Liberty, "retrospective premiums" would become due based on a formula set forth in the insurance contract.[3]

In May, 1994, Nortek and Liberty settled two lawsuits involv-

---

[2]The factual and procedural history of the case is complex. We sketch so much as necessary to frame the issues of the case, viewing the facts in the light most favorable to the plaintiffs and reserving for our discussion other facts material to the disposition.

[3]The provisions of the parties' agreement concerning such retrospective premiums were contained in a separate rating agreement, incorporated by reference in the insurance policies. Under the terms of the rating agreement, the amount of any single loss payment that could be applied toward calcula-

ing a dispute over Liberty's coverage obligations and Nortek's liability for previously billed retrospective premiums.[4] As part of the settlement, Nortek pledged certain securities to secure its obligations to pay retrospective premiums arising in the future; under the terms of the pledge and security agreement, Liberty was authorized to liquidate such securities to satisfy premiums that Nortek did not pay when due.

As its name suggests, APT manufactured various pneumatic tools. Beginning in 1989, APT was named in a series of lawsuits in Mississippi claiming that certain of its products had caused hearing loss in workers who used them. Liberty advised Nortek by letter that the policy applicable to Nortek's claim of coverage was the policy in effect from 1988-1989, and it allocated the costs of defense of the hearing loss claims to that policy year. In September, 1994, Liberty agreed to pay approximately $3 million in settlement of those claims, in addition to $400,000 incurred in defense costs. Thereafter (based on its conclusion that it was impossible to ascertain when the hearing losses which resulted in the covered liability had occurred), Liberty determined to allocate those costs among the various policies it had issued to Nortek and MPDC's predecessor from 1976 through 1989. That allocation resulted in a higher retrospective premium than if all such costs had been treated as incurred in the 1988-1989 policy year. On July 28, 1995, Nortek wrote to Liberty to express its disagreement with Liberty's decision to allocate losses to prior policy years. By letter dated August 30, 1995, Liberty responded that it would investigate the situation and get back to Nortek. Representatives of the two parties discussed their respective positions intermittently between 1995 and 1999, without resolution. Though the invoices themselves are not in the record, the parties appear to agree that, beginning

tion of the retrospective premium for any year was subject to a maximum amount (which varied among the several policy years). We omit discussion of other details of the parties' agreement that are not material to the issues of the case.

[4]Though the lawsuits which spawned the losses and attendant retrospective premiums at the center of the parties' present dispute were pending at the time of the May, 1994, settlement, the present dispute was not the subject of the two lawsuits or the settlement, and (as we shall explain) arose out of events that occurred later.

in 1995, Liberty submitted invoices to Nortek for payment of premiums in the amounts it claimed as due; however, with one exception due to inadvertence, Nortek did not pay the invoices.[5] In a telephone conversation on January 28, 1999, Nortek's representative received for the first time Liberty's substantive response to his July 28, 1995, letter. In that conversation, Liberty advised that, following its review of Nortek's concerns, Liberty had concluded that it would nonetheless insist on payment of retrospective premiums based on the allocation of claims to various policy years, as previously expressed and invoiced. Nortek persisted in its view that Liberty's allocation method was inappropriate, and did not pay the invoiced amounts. In October, 2001, Liberty liquidated securities held under the pledge and security agreement to satisfy amounts it claimed due as retrospective premiums, based on its method of loss allocation and premium calculation.

On September 25, 2002, Nortek and MPDC filed their complaint claiming breach of contract, conversion, and violation of G. L. c. 93A, § 11, and seeking a declaration of the parties' rights and obligations. Liberty counterclaimed against MPDC, seeking recovery of $665,178 Liberty claimed due from it.[6]

The case progressed toward trial, scheduled for June 1, 2004. On May 21, 2004, Nortek and MPDC jointly filed an offer of judgment under Mass.R.Civ.P. 68, 365 Mass. 835 (1974), offering "to allow judgment to enter in favor of [Liberty] in the amount of FIVE HUNDRED THIRTY THOUSAND EIGHT HUNDRED FORTY-SEVEN DOLLARS ($530,847.00), in full satisfaction of Liberty's counterclaims." On May 25, 2004, Liberty filed its notice of acceptance of the offer of judgment, and requested entry of judgment against MPDC in accordance

---

[5] In 1996, Nortek accidentally paid approximately $22,000 toward one of the disputed retrospective premium charges. When Nortek discovered its mistake, it informed Liberty and Liberty applied the payment to an unrelated premium charge.

[6] In an invoice sent to Nortek in October, 2002, reflecting the application of the proceeds of the liquidated securities, Liberty showed a small credit due to Nortek. MPDC was not a party to the pledge and security agreement, and the proceeds of the liquidated securities were not applied toward the amounts Liberty claimed from MPDC.

with it. Shortly thereafter, on May 27, 2004, Liberty filed a motion to dismiss MPDC as a plaintiff, and for summary judgment against Nortek on the ground that its claims were barred by the six-year statute of limitations applicable to claims for breach of contract. A judge of the Superior Court allowed Liberty's motion, directed entry of judgment accordingly, and denied the plaintiffs' postjudgment motions for relief under Mass.R.Civ.P. 59(e), 365 Mass. 827 (1974), and Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974).[7] This appeal followed.

*Discussion.* a. *Statute of limitations.* An action for breach of contract must be brought within six years after the cause of action accrues. G. L. c. 260, § 2. "A cause of action for breach of contract accrues at the time of the breach. . . . even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time." *International Mobiles Corp.* v. *Corroon & Black/ Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 221 (1990) (citations omitted).

The plaintiffs' breach of contract claim rests on their contention that Liberty's allocation of losses to policy years other than 1988-1989 constituted a breach of the covenant of good faith and fair dealing implied in every contract. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).[8] Liberty argues (and the motion judge agreed) that Liberty's allegedly improper allocation of losses occurred in

---

[7]Because Liberty filed its motion for summary judgment long after the time had expired under the applicable tracking order, the motion judge treated it as analogous to a motion for a directed verdict after the close of opening statements at trial. The standard of our review is the same under either approach, see *Shimer* v. *Foley, Hoag & Eliot, LLP*, 59 Mass. App. Ct. 302, 303 n.3 (2003), and, though the plaintiffs express some degree of protest with the judge's procedural handling of the defendant's motion, our disposition of the merits renders any such concerns immaterial.

[8]As alleged in their complaint, the plaintiffs' breach of contract claim could have been read more broadly to embrace a separate claim that Liberty's application of collateral, in October, 2001, to satisfy its claim for unpaid retrospective premiums breached the parties' agreement insofar as it took from Nortek more than was properly due under the contract. However, in the joint pretrial memorandum and in other pretrial filings (particularly including its opposition to Liberty's motion to strike Nortek's claim of a jury trial), Nortek appeared to restrict its breach of contract claim to an assertion that Liberty's allocation method breached the implied covenant of good faith and fair deal-

1994, and that Nortek expressed its awareness of Liberty's chosen method at least as early as July 28, 1995. Accordingly, even if the limitations period were tolled for the period preceding the plaintiffs' discovery of the breach, see *International Mobiles, Corp.* v. *Corroon & Black/Fairfield & Ellis, Inc.*, *supra* at 222, the six-year statute of limitations under G. L. c. 260, § 2, would have expired on July 28, 2001.

On the record before the motion judge, we view the matter differently. Though Nortek was aware in July, 1995, that Liberty had allocated losses in a manner with which Nortek disagreed, Liberty expressed to Nortek at that time, and for a lengthy period thereafter, its intention to investigate and consider Nortek's contrary position and to furnish a response. Though Liberty had submitted invoices for retrospective premiums based on the disputed allocation, it took no steps to collect payment in accordance with those invoices, and indeed (at Nortek's request) credited Nortek's account on the one occasion on which Nortek inadvertently tendered payment on one of the disputed invoices. See note 5, *supra.* It was not until early in 1999 that Liberty informed Nortek that it intended to insist on its allocations, upon consideration and rejection of Nortek's protestations to the contrary. Assuming, without deciding, that the mere assertion (unaccompanied by collection action) of an unsupported right to payment constitutes an actionable breach of the covenant of good faith and fair dealing, the record indicates that the assertion did not reflect Liberty's final or definitive position, and the breach of the implied covenant consequently did not occur, until January, 1999.[9] It is difficult to imagine that the burden should be on Nortek, as the party owing payment of a disputed amount

ing, and the motion judge based his analysis of the statute of limitations on that narrow claim. Though it is possible to read Nortek's continuing claim to include breach by Liberty's collection of amounts in excess of those actually due under the parties' contract, under our view of the case it is unnecessary to resolve the precise contours of the claimed breach in order to resolve the application of the statute of limitations, and it is open to Nortek to clarify the precise nature of its claim or claims of breach for purposes of the further proceedings that are to occur in the Superior Court after remand.

[9]Because Nortek's complaint was timely filed even if its cause of action accrued on January 28, 1999, we need not decide whether, in the circumstances, the unequivocal and final assertion of a claim by one party for payment of an amount disputed by the counterparty to a contract is itself a breach, or whether

to a creditor which had taken no legal action to collect the debt and which had further indicated an intention to investigate the dispute, to initiate an action claiming breach of contract at any time before Liberty's 1999 rejection of Nortek's protest. It was error to dismiss the breach of contract claim on the ground of the statute of limitations.

The plaintiffs' claim under G. L. c. 93A, § 11, rests on essentially the same alleged misconduct. Though subject to a shorter, four-year, limitations period under G. L. c. 260, § 5A, the plaintiffs' c. 93A claim likewise was not time-barred, as the complaint was filed within four years following the first date on which Liberty unequivocally and finally rejected Nortek's position on the proper method for allocation of losses and computation of retrospective premiums.[10] See *International Mobiles Corp.* v. *Corroon & Black/Fairfield & Ellis, Inc.,* supra at 220-221.

Nortek's claim for conversion sounds in tort, and the applicable limitations period accordingly is three years. See *Patsos* v. *First Albany Corp.,* 433 Mass. 323, 327-328 n.6 (2001); G. L. c. 260, § 2A. A cause of action in tort accrues on the date the plaintiff suffers injury or loss. See *International Mobiles Corp.*

the timeliness of a complaint seeking recovery of alleged overpayments under a contract is measured from the time the alleged overpayment changes hands. Liberty cites *Szymanski* v. *Boston Mut. Life Ins. Co.,* 56 Mass. App. Ct. 367, 383 (2002), to suggest that "the pertinent inquiry here with regard to accrual is not when the plaintiff first had to pay unanticipated premiums . . . but rather, when the plaintiff was on notice that he had purchased a policy that was to cost him far more than originally represented." However, *Szymanski* involved a claim that the policy sold to the plaintiff was different in kind from the policy the plaintiff agreed to purchase. The breach was the substitution of a different product from that specified in the parties' agreement, the date of the breach was the date of the substitution, and the statute accordingly began to run from the date the plaintiff could reasonably have discovered the difference. All of the other cases cited by Liberty to support its position involved claims by an insurer to recover payment of premiums that had been invoiced and remained unpaid, except for one case (*American Ins. Co.* v. *Midwest Motor Express, Inc.,* 554 N.W. 2d 182 [N.D. 1996]), which involved an attempt by an insured to recover overpayments previously made on allegedly inflated invoices. The parties have directed us to no other authority for the proposition that the mere assertion of a claim for payment in excess of the amount required by the parties' contract constitutes a breach necessitating timely action by the party from which such payment is sought.

[10]See note 9, *supra.*

v. *Corroon & Black/Fairfield & Ellis, Inc., supra* at 217-218 (involving action for negligence). Nortek's conversion claim rests on its contention that the amounts Liberty took from the collateral account pledged to satisfy Nortek's obligations for retrospective premiums exceeded the amounts Nortek actually owed, and to the extent of that excess unlawfully deprived Nortek of its property. The cause accordingly accrued in October, 2001, when Liberty liquidated the collateral and applied the proceeds to satisfy its version of the premium amounts due. Nortek's complaint, filed in September, 2002, fell comfortably within the applicable limitations period.

b. *Offer of judgment.* On May 21, 2004, pursuant to Mass.R. Civ.P. 68, the plaintiffs served on Liberty an offer of judgment, the terms of which are set out in their entirety in the margin.[11] On May 25, 2004, Liberty filed with the court both the offer of judgment and its notice of acceptance, and requested that the clerk enter judgment thereon in accordance with rule 68. When Liberty thereafter moved to dismiss Nortek's affirmative claims on grounds of the statute of limitations, Nortek moved unsuccessfully to withdraw its offer of judgment and, after final judgment entered, moved unsuccessfully for relief from the judgment under Mass.R.Civ.P. 60(b).

Mass.R.Civ.P. 68 provides:

"At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter

---

[11]"Plaintiffs and Defendants in Counterclaim, Nortek, Inc. and MPDC, Inc., pursuant to Mass. R. Civ. P. 68, hereby offer to allow judgment to enter in favor of the Defendant and Plaintiff in Counterclaim, Liberty Mutual Insurance Company ("Liberty"), in the amount of FIVE HUNDRED THIRTY TWO THOUSAND EIGHT HUNDRED FORTY-SEVEN DOLLARS ($532,847.00), in full satisfaction of Liberty's counterclaims. If within 10 days after the service of this offer, Liberty does not serve written notice of its acceptance, the offer shall terminate."

judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment exclusive of interest from the date of offer finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer. The fact that an offer is made but not accepted does not preclude a subsequent offer. When the liability of one party to another has been determined by verdict or order or judgment, but the amount or extent of the liability remains to be determined by further proceedings, the party adjudged liable may make an offer of judgment, which shall have the same effect as an offer made before trial if it is served within a reasonable time not less than 10 days prior to the commencement of hearings to determine the amount or extent of liability."

As the motion judge observed, no Massachusetts case has considered whether an offeror may seek to rescind or withdraw an offer of judgment after it has been accepted. However, "[i]n construing [the Massachusetts Rules of Civil Procedure] we follow the construction given to the Federal rules 'absent compelling reasons to the contrary or significant differences in content.' " *Baghdady* v. *Lubin & Meyer, P.C.*, 55 Mass. App. Ct. 316, 325 (2002), quoting from *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. 410, 414 (1998). There are no significant differences in content between the Massachusetts and Federal rules to suggest different application. See *Baghdady* v. *Lubin & Meyer, P.C.*, *supra*. We accordingly look to Federal cases for guidance.

In general, principles of contract law apply to determine the terms and effect of offers of judgment under rule 68. See *Radecki* v. *Amoco Oil Co.*, 858 F.2d 397, 400 (8th Cir. 1988); *Webb* v. *James*, 147 F.3d 617, 620 (7th Cir. 1998). "Under basic contract law principles, for an offer and acceptance to create a binding agreement there must be an objective manifestation of mutual assent, i.e., what is often referred to (somewhat misleadingly) as a 'meeting of the minds,' see 1 A. Corbin, Corbin on Contracts § 107, at 478-479 (1963)." *Radecki* v. *Amoco Oil Co.*, *supra*.

The plaintiffs contend that their offer of judgment, which Liberty accepted without qualification or condition, did not create a binding agreement for judgment because they intended it to resolve only certain premium claims unrelated to premiums arising from the Mississippi hearing loss claims, as the result of a partial agreement reached in settlement negotiations with Liberty. The most significant difficulty with the plaintiffs' contention is that the offer of judgment does not say any such thing, or contain any ambiguity concerning its scope and purpose as would allow consideration of extrinsic evidence in construing its terms. By its express terms, it consents to the entry of judgment in Liberty's favor on its counterclaims, which sought damages of $665,178 from MPDC for its nonpayment of various unpaid invoices for retrospective premiums.[12] As the offering party, the plaintiffs held complete control over the terms expressed in the offer of judgment served on Liberty; if they intended their offer to attach to claims unrelated to the Mississippi hearing loss claims, or to resolve disputes between the parties beyond the subject of Liberty's counterclaim, it was open to the plaintiffs to express that intention in the offer. It is the language the plaintiffs used in their offer, and not their undisclosed subjective intent, that determines its meaning. See *Champlin* v. *Jackson*, 317 Mass. 461, 464 (1945); *Churgin* v. *Hobbie*, 39 Mass. App. Ct. 302, 306 (1995).

The plaintiffs cite two cases to support their contention that the offer and acceptance in the present case did not form an agreement for judgment because there was no "meeting of the minds." See *Radecki* v. *Amoco Oil Co.*, 858 F.2d at 402-403; *Stewart* v. *Professional Computer Center, Inc.*, 148 F.3d 937, 939 (8th Cir. 1998). Both involved offers that were ambiguous on the question whether they embraced attorney's fees within the sum offered on the plaintiff's claim; since the offer in the present case was unambiguous, the cases are inapposite.[13]

We are mindful as well that an offer of judgment under rule

[12]Liberty's counterclaim was asserted only against MPDC; Nortek's joinder in the offer appears to have been inadvertent.

[13]We reject the plaintiffs' contention that Nortek's joinder in the offer created an ambiguity. The express terms of the offer made clear that it was intended to satisfy Liberty's counterclaims. The fact that those counterclaims ran only against MPDC and not against Nortek did not render ambiguous the

68 is different from an ordinary offer extended toward formation of a contract, in that it has a binding effect against the offeree whether it is accepted or not. That is to say, " 'a Rule 68 offer imposes certain consequences that can be costly for the [offeree] who declines the offer. The Rule is thus designed to put significant pressure on the [offeree] to think hard about the likely value of its claim as compared to the [offeror's] offer. . . .' *Richardson* [v. *National R.R. Passenger Corp.*, 49 F.3d 760, 765 (D.C. Cir. 1995)]. . . . [B]ecause rejection of the offer can have serious consequences for the [offeree], courts have rightly been reluctant to allow [offerors] to challenge the meaning of an offer of judgment, either before or after acceptance." *Webb* v. *James*, *supra* at 621.[14] Moreover, challenges by the offeror to the meaning of an accepted offer of judgment tend to undermine the purpose of rule 68 to encourage settlement and avoid protracted litigation.[15] *Ibid.* Because the situation of the recipient of a rule 68 offer is different from that of the recipient of an ordinary offer, and because of the potential counterproductive effect of allowing protracted proceedings to explore disputes over whether unqualified acceptance of an unambiguous offer accurately reflects the parties' intentions, we agree with those courts which have concluded that the principles allowing a party to avoid a contract by reason of a unilateral mistake should be applied less generously, or only in particularly extreme circumstances, to an agreement for judgment under rule 68. See, e.g., *Webb* v. *James*, *supra* at 621. Compare *Whitaker* v. *Trans Union Corp.*, 946 F.2d 1222 (6th Cir. 1991) (defendant relieved of judgment entered on offer of judgment, where typographical error offered judgment for $500,000 rather than $500).

Relief from a judgment entered pursuant to rule 68 nonethe-

---

offer of judgment for a specific amount in full satisfaction of the claims.

[14]In the paradigmatic circumstances of an offer of judgment, the defendant is the offeror and the plaintiff is the offeree. The plaintiffs' offer in the present case related to Liberty's counterclaim, as to which MPDC was defendant in counterclaim. See note 12, *supra*.

[15]Indeed, the prospect of collateral proceedings weighing extrinsic evidence on an offeror's claim that its offer was intended to mean something other than expressed in its unambiguous terms seems particularly at odds with the purpose of the rule.

less may be available under Mass.R.Civ.P. 60(b). See *Webb* v. *James*, *supra* at 622. Such relief is available where the judgment is the product, inter alia, of "mistake, inadvertence, surprise, or excusable neglect." Mass.R.Civ.P. 60(b)(1). A motion for relief under rule 60(b) is directed to the sound discretion of the motion judge, and we review the judge's ruling for abuse of discretion. See *Berube* v. *McKesson Wine & Spirits, Co.*, 7 Mass. App. Ct. 426, 433-435 (1979). In his memorandum and order denying the plaintiffs' motion for relief from the judgment on Liberty's counterclaim pursuant to rule 68, the motion judge observed that the "mistake" from which the plaintiffs sought relief (if properly characterized as a mistake at all) appeared to arise from a mistake by plaintiffs' counsel in careless or infelicitous drafting of the offer. In light of the "marked deference" accorded the exercise of discretion by a motion judge in ruling on a rule 60(b) motion, see *Cullen Enterprises, Inc.* v. *Massachusetts Prop. Ins. Underwriting Assn.*, 399 Mass. 886, 894 (1987) (quotation omitted), we decline to disturb the motion judge's conclusion that such a mistake does not warrant relief in the circumstances. See also Smith and Zobel, Rules Practice § 60.4, 60.5 (1977).

*Conclusion.* The order denying the plaintiffs' postjudgment motions for relief is affirmed. So much of the judgment as dismissed the plaintiffs' claims for breach of contract, conversion and violation of G. L. c. 93A, § 11, as barred by the applicable statutes of limitations, as well as the plaintiffs' request for a declaration of the rights and obligations of the parties, is reversed. The remainder of the judgment, as to the counterclaims, is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*