NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1339

RENITA K. JOHNSON[1]

vs.

GEORGE J. KERAMAS[2] & another.[3]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Renita K. Johnson, brought this action against her brother, George J. Keramas, and his wholly owned company, Acriva Group, Inc. (Acriva), seeking a fifty percent share of certain assets owned by their late father and also held in a trust of which the father was the settlor.  After protracted litigation, a judge of the Superior Court entered partial summary judgment in favor of Johnson and a different judge later entered a default in favor of Johnson on all

_____

[1] Individually and as trustee of Keramas Realty Trust.

[2] Individually and as former trustee of Keramas Realty Trust.

[3] Acriva Group, Inc.  Acriva also filed notices of appeal but has not filed a brief in this appeal.

remaining claims and counterclaims due to the defendants' noncompliance with discovery orders.  Judgment entered following a damages assessment hearing.  Keramas appeals from that judgment as well as orders on certain postjudgment motions.[4] Keramas argues that Johnson was not entitled to summary judgment or the default judgment, and challenges various other rulings. We affirm.

Background.  1.  Facts.  a.  Parties and trust.  In 1980, the parties' father, James G. Keramas (father), executed a declaration of trust for the Keramas Realty Trust (trust) and recorded it with the Middlesex County registry of deeds.  The trust later was amended on three occasions, in 1981, 1991, and 2006, through writings signed by all beneficiaries and recorded with the registry of deeds, consistent with the terms of the trust.

Under the provisions of the amended trust, Johnson and Keramas were the sole beneficiaries; they were entitled to share equally in the income while the trust was in existence and to equally split the principal on termination of the trust.  The

_____

[4] Keramas appeals from orders dated November 18, 2021, denying Johnson's motion to alter and amend the judgment and the defendants' motion to remove default and vacate the final judgment, as well as from orders dated February 15, 2022, denying the defendants' motion to enforce automatic stay and for sanctions and allowing Johnson's motion for an order compelling the defendants to comply with postjudgment discovery requests.

2

trust would terminate on execution and recording of a writing to that effect by the father or by both beneficiaries after the father's death, or, otherwise, on December 13, 2026. The father was appointed trustee, with Keramas and then Johnson, in that order, to serve as successor trustees. As trustee, the father had the right to decide when and if to make income distributions to the beneficiaries during his lifetime. Although not expressly provided for in the trust, the father exercised complete control over the trust and its assets during his lifetime, including by transferring assets in and out of the trust without the consent of the beneficiaries and without objection.

In 2009, the father moved from Massachusetts to Florida. In February 2015, the father was admitted to the hospital in Florida. During the hospitalization, Keramas presented the father with documents to sign that appointed Keramas as trustee and as the father's attorney-in-fact; Keramas later gave the father signature pages to sign and thereafter attached them to other documents, including one that gave Keramas access to one of the father's personal accounts. A few days later, Keramas presented the father with a document to further amend the trust (amendment). The amendment had the effect of appointing Keramas as trustee and making Keramas the sole income beneficiary during his lifetime (a change from sharing the income with Johnson).

3

On the termination of the trust and sale of its assets, Keramas and Johnson remained entitled to equal shares. At the time, the trust held title to rental properties, described more fully below.

The father signed the amendment and Keramas then sought Johnson's signature. In March 2015, Keramas and Johnson exchanged e-mail messages about the amendment (March 2015 e-mails). Keramas explained that he would become the trustee and the sole income beneficiary, i.e., would receive income from the rents collected after expenses. Keramas also explained that Keramas and Johnson would remain the beneficiaries who share proceeds on the sale of the properties. Johnson asked when she would receive her share and how she would be aware of the sale of the properties, and Keramas explained,

> "The trust assets consist of the properties. . . . In the trust, it says that upon dad's death, the trust will be dissolved and the proceeds distributed among the beneficiaries. That would be you and me. . . . Practically speaking, after dad's death, the properties would have to be sold and the proceeds divided between us. You and I would have to sign for the sale of each property at the closing as the beneficiaries can only jointly sell properties at that time. At the closing, there would be 2 checks given to us, each for 50% of the proceeds from the sale, one in your name and one in my name."

After some further urging by Keramas, Keramas and Johnson executed the amendment in the presence of a notary and Keramas recorded the amendment.

4

The father passed away in April 2015.  Johnson alleges that the father died intestate and that all property owned by her father in his individual name passed to Keramas and Johnson as his only heirs.[5]

b.  Assets.  At the time of the father's hospitalization, the following assets were owned by the father, either individually or jointly, or the trust.

i.  Trust properties.  The trust held title to five parcels of real estate, including one residential property in Massachusetts, and three residential rental properties and one commercial shopping mall in Florida.  The father, as trustee, also held a bank account with a balance of $7,472, that served as the primary operating account for the rental properties held by the trust.

In November and December 2015, after the father's death, Keramas, as trustee, sold three of the trust properties; the combined proceeds from those sales was $553,873.  Keramas, as trustee, later received a $65,000 insurance settlement for damage at one of those properties.  Johnson did not participate in any of the closings and did not receive any distributions

---

[5] Prior to his death and while in the hospital, Johnson alleges that Keramas prepared a will for the father.  The will named Keramas as executor.  Keramas refused to produce the original will and the parties represented during a hearing that as of October 2021, the will had not been submitted to probate.

from the trust after the sales. In September 2016, Keramas withdrew $350,000 from the trust account and deposited the funds in an account in his own name. During the time that he was trustee, Keramas also transferred $189,750 of trust funds to himself and to his alter ego, Acriva, without Johnson's knowledge. Keramas further used at least $147,700 in trust funds to pay four law firms for legal work defending Keramas in a different action not involving the trust, representing him in a since-dismissed lawsuit wherein he sought a declaration that the trust no longer existed, and "defend[ing] his actions in refusing to disclose financial information regarding the Trust to [Johnson]" while he was trustee.

As discussed below, during this litigation, Johnson replaced Keramas as trustee. Thereafter, Johnson sold the two remaining trust properties in May 2019 and February 2020, and deposited the net proceeds from the sales, $1,028,474, into the trust account. At the time judgment entered in fall 2021, the balance of the trust account was $1,087,328.

ii. New England Realty Associates shares. The father owned shares in New England Realty Associates, valued at approximately $385,400 (NERA shares); some of the shares were in "certificate form" and others were in "book entry form." Shortly before the father's death, Keramas attempted to sell the father's NERA shares using a form that Keramas forged with the

6

father's signature. The transfer agent for the shares accepted the form and sold the book entry form NERA shares for $256,286. A check in that amount was issued to the father, who, unbeknownst to the transfer agent, was then deceased; Keramas signed his father's name on the check and deposited it in an account he controlled. Keramas was unable to sell the remaining certificate form NERA shares; however, by impersonating his father, Keramas was able to have the dividends from those shares, totaling $20,249, directly deposited into an account in his name.

iii. <u>The father's bank accounts</u>. The father had two personal bank accounts, one with a balance of $4,313 and one with an unknown balance (personal accounts). After the father's death, Keramas took possession of the funds in the personal accounts.

iv. <u>Certificates of deposit</u>. The father owned three certificates of deposit, totaling $920,228, that were each titled in the father's name in trust for Johnson as beneficiary (CDs). While the father was in the hospital, he told Johnson that she was the beneficiary of the CDs and asked her to contact a specific bank officer to effectuate the transfer of the CDs to her name. Johnson did so, and the father executed paperwork so that the CDs were reissued in Johnson's name.

v. Bank accounts in Greece. The father and Johnson had two joint accounts at Alpha Bank of Greece, one with a balance of 120,000 euros and one with a balance of $457,206 (Alpha accounts). The father informed Johnson about the accounts while he was in the hospital and the accounts automatically passed to Johnson on his death.

vi. Automobile. The father owned a Mercedes automobile that he purchased for $15,000. Keramas sold the car following the father's death and kept or used the proceeds for himself or his girlfriend.

2. Procedural history. Because the procedural history of this case is lengthy and complicated, we briefly discuss some relevant rulings, somewhat out of order, and reserve others for our later discussion.

a. Complaint. Johnson brought this action against Keramas in August 2017. Johnson filed her second amended complaint against Keramas and Acriva, with leave of the court, in June 2020. In that complaint, Johnson sought a declaration that she is the owner of the funds held in the CDs (count 1) and the Alpha accounts (count 2). She also alleged a breach of contract based on the March 2015 e-mails (count 3). Johnson alleged conversion of the personal bank accounts and the automobile (count 4), and that Keramas improperly retained Johnson's one-half portion of the proceeds from the sale of some NERA shares

8

and the dividends from the others (count 5). Johnson further alleged that Keramas improperly transferred trust funds to himself and his alter ego, Acriva (count 6), and sought orders concerning the tax returns filed by Keramas as trustee (count 7). Keramas asserted counterclaims seeking a declaration that the CDs and Alpha accounts were trust property and requesting imposition of constructive trust and instructions.

b. Preliminary injunction, partial summary judgment, and alternate security. Shortly after the filing of this suit, in October 2017, Johnson successfully moved for a preliminary injunction that froze the assets in the trust account until further court order and directed that the proceeds of any future sale of the two remaining trust properties be placed in that account.[6]

In August 2018, Johnson moved for partial summary judgment and the motion was allowed, in part, only as to liability for Johnson's breach of contract claim. The judge also "expand[ed]" the preliminary injunction by requiring Keramas to establish an escrow account in the amount of $309,437 (representing Johnson's share of sale proceeds from the three trust properties Keramas sold and the insurance settlement).

---

[6] Johnson filed this motion after learning that one of the remaining trust properties was under contract for sale. That sale ultimately fell through.

9

Thereafter, Keramas filed a motion for alternate security, requesting that in lieu of establishing the escrow account, the court order Johnson to replace Keramas as trustee and assign Johnson security in Keramas's fifty percent share of the expected trust distribution following the sale of the remaining properties. A judge granted Keramas's request and additionally ordered, among other things, that Johnson attempt to sell the remaining properties and thereafter terminate the trust.

c. Default. The issue of discovery was heavily litigated between the parties. The subject of such litigation included, among other things, discovery as to the disposition of the $350,000 that Keramas transferred from a trust account to a personal account in September 2016 and the $256,285 that Keramas directly received from the sale of some of the NERA shares in May 2015. After Johnson filed motions to compel and for sanctions, two judges entered discovery orders in January 2018, March 2020, June 2020, July 2020, and October 2020, directing Keramas to produce documents related to one or both of these transactions and, in at least one instance, to produce documentation of his efforts to obtain certain bank records relevant to the transactions.

In March 2021, a third judge entered an order stating that Johnson "is entitled to full and complete discovery from [Keramas] regarding [Keramas's] $350,000 withdrawal from the

Trust bank account and the disposition of the $256,000 from the sale of the [NERA] shares."  In April 2021, the same judge entered a discovery compliance order directing Keramas to produce "a full, complete and accurate accounting" of the disposition of both amounts that "begin[s] on the date that the . . . funds were deposited in the initial recipient accounts and shall include each and every withdrawal or transfer" thereafter.  The accounting was to be executed under penalties of perjury and to show each transfer to present, accompanied by monthly statements and cancelled checks.

In July 2021, Johnson moved for default based on noncompliance with the April 2021 order.  In August 2021, at a hearing on the motion, a fourth judge made oral findings that Keramas violated the April 2021 order and entered default against Keramas and Acriva.

d.  Damages.  In October 2021, an assessment of damages hearing was held before the same judge who entered the April 2021 order.  Following that hearing, judgment entered declaring Johnson as the owner of the funds in the CDs and the Alpha accounts, and the owner of fifty percent of the funds in the father's personal accounts as of February 15, 2015.  Johnson was awarded $309,436 on her breach of contract claim, $7,500 for the automobile, $10,124 for the dividends from the NERA shares, and $128,142 from the sale of the other NERA shares, plus interest.

11

The judge also treated the $337,450 that Keramas took from the trust funds for himself, Acriva, or attorney's fees while he was trustee as "advanced Trust funds."  To partially satisfy the judgment, Johnson was permitted to "immediately withdraw" and distribute to herself the funds held in the trust account ($1,087,328), and Johnson was awarded ownership of the remaining NERA shares ($155,760).[7]  That judge later denied the parties' postjudgment motions, described more fully below, and this appeal followed.

Discussion. 1. Motion to dismiss. Keramas contends that the judge should have allowed his motion to dismiss counts 4 and 5 of the second amended complaint that pertain to the father's personal bank accounts, automobile, and the NERA shares. Keramas first argues that to claim a right to property from the father's estate, Johnson was required to adjudicate the issue of their father's heirs and testacy in the probate court or in Florida (where the father was domiciled at the time of his death).  We disagree.  Here, Johnson alleges that the father died intestate and that she and Keramas are the father's only heirs.[8]  She alleges that Keramas, a Massachusetts resident,

_____

[7] With Johnson's consent, the judge dismissed count 7, related the trust's tax returns.

[8] The father was married at the time of his death, but his spouse had relinquished her rights to any property owned by the parties individually at the time of marriage or acquired

12

converted property from the father's estate, used the assets for his own personal benefit, and refused to account for the money. Such equitable claims may be adjudicated in the Superior Court. See Consedine v. Consedine, 39 Mass. App. Ct. 65, 68-69 (1995) (Superior Court had equitable jurisdiction over claim by heir who resided in Massachusetts that assets of foreign estate were converted by another Massachusetts resident). These claims may proceed "without impinging upon the ultimate authority of the domiciliary court to adjudicate the rights of the parties in the estate property." Id. at 68. See Kaltsas v. Kaltsas, 22 Mass. App. Ct. 689, 692 (1986). However, the fact that the parties could have, but did not, first seek probate of the father's estate in Florida is not dispositive on the issue of subject matter jurisdiction, particularly where the estate's assets are allegedly held exclusively by the parties, who are both Massachusetts residents.[9] Cf. McCarron v. New York Cent. R.R. Co., 239 Mass. 64, 69 (1921) (where primary administration of estate should be granted to State of domicile, courts of another

_____

thereafter individually. Although some evidence was presented of the existence of a will, neither party sought probate of that document and, therefore, they cannot rely on it to establish title. See G. L. c. 190B, § 3-102.

[9] Although it was represented during the proceedings that Keramas "seems to go back and forth" between Massachusetts and Florida, the second amended complaint alleges that he resides in Massachusetts.

13

State with jurisdiction need not wait for proceedings to be brought in domiciliary state). We similarly reject Keramas's argument that these claims must be brought by a personal representative of the father's estate. See G. L. c. 230, § 5 (if "executor or administrator" is unable to bring action in favor of estate "by reasons of his interest or otherwise," heir may bring action).[10]

2. Summary judgment. Keramas next argues that Johnson was not entitled to summary judgment on her breach of contract claim. "An enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms" (citation omitted). Duff v. McKay, 89 Mass. App. Ct. 538, 543 (2016).

Here, the parties' March 2015 e-mails leading to the execution of the trust amendment contain an unambiguous statement of the essential terms of a contract. Keramas sought approval from Johnson to become the sole income beneficiary of

_____

[10] Because Johnson added counts 4 and 5 through an amendment to her complaint and those equitable claims arise out of conduct previously alleged, that amendment relates back to the date of the filing of the original complaint in August 2017 and her claims are timely. See G. L. c. 231, § 51; Mass. R. Civ. P. 15 (c), 365 Mass. 761 (1974). The statute of repose that applies to an "informal probate or appointment proceeding or formal testacy or appointment proceeding" is inapplicable here. G. L. c. 190B, § 3-108.

14

the trust.  Keramas explained that the provision making them equal beneficiaries of the trust principal would remain unchanged, and further that the properties would be sold on the father's death, they would both sign for each sale, and the proceeds would be equally divided between them at the closing.[11]  Keramas also stated that he "expect[ed] all of the properties will be sold within 12 months of dad's death."[12]  See Duff, 89 Mass. App. Ct. at 544 (whether parties agreed to all material terms is question of law where negotiations were memorialized in trail of uncontested e-mail messages).

This agreement did not constitute an improper modification of the trust because it was not contrary to the terms of the trust.  After their father's death, Keramas and Johnson had the right to terminate the trust by agreement for any reason (or no reason at all).  Although the trust required that certain formalities be met, including that a writing be signed by all beneficiaries and recorded, those formalities could not be

---

[11] Even if, as Keramas argues, the Statute of Frauds was applicable, the March 2015 e-mails satisfy the requirement that the agreement be reduced to a "writing and signed by the party to be charged therewith."  G. L. c. 259, § 1.  See K & K Dev., Inc. v. Andrews, 103 Mass. App. Ct. 338, 349 (2023) (e-mail messages satisfied Statute of Frauds).

[12] To the extent Keramas argues that he could not alienate his beneficial interest under the terms of the trust, he did not do so by this agreement.  He simply agreed to exercise his express right terminate the trust with Johnson's consent on the father's death.

15

followed until the father's death.  See Targus Group Int'l, Inc. v. Sherman, 76 Mass. App. Ct. 421, 431 (2010) ("If [the parties] identify present unknowns or subsequent contingencies and provide mechanisms or norms for their accommodation, their agreement will be binding").  The parties were free to agree to terminate the trust on the father's death, as they did here. See Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 518 (1998), cert. denied, 525 U.S. 1177 (1999) (parties may be bound by agreement contingent on future events).

The parties also objectively manifested their present intent to be bound by the agreement.  See, e.g., Nortek, Inc. v. Liberty Mut. Ins. Co., 65 Mass. App. Ct. 764, 772 (2006). Johnson accepted Keramas's offer, they both executed the trust amendment, and Keramas recorded it.  Finally, the agreement was supported by mutual consideration.  Johnson relinquished her right to an equal share of the trust's income during the remainder of the father's life and in the period before the sale of the properties.  In exchange, both parties promised to terminate the trust on the father's death.  The agreement was enforceable.

3.  Alternate security.  Keramas next argues that the judge exceeded his authority in entering the alternate security order because the judge effectively terminated the trust and defeated the trust's purpose.  "The decision [to terminate a trust

16

depends upon] whether the purposes of the trust have been achieved[. It] is a judicial matter.  The courts alone can make that decision" (citation omitted).  Steele v. Kelley, 46 Mass. App. Ct. 712, 729 n.19 (1999).

Keramas requested that the court appoint Johnson as trustee and assign her a security interest in his expected trust distributions following the sale of the remaining properties, because he did not have the funds necessary to establish the previously-ordered escrow account.  The judge additionally ordered that Keramas agree to sell the remaining properties and Johnson take steps to terminate the trust.  That order did not defeat the trust's purpose.  Although Keramas now argues that the purpose was "to buy, sell, hold, invest, manage and rent commercial and residential real estate and personal property for income and appreciation," Keramas and Johnson were explicitly permitted to terminate the trust by consent after the father's death.  Where, as here, Keramas and Johnson agreed to terminate the trust on the father's death and Keramas sold three of the five trust properties, Johnson can compel termination of the trust.  Cf. Restatement (Second) of Trusts § 337 comment c (1959) ("If a beneficiary of the trust consents to its termination but withdraws his consent before the trust is terminated, the other beneficiaries cannot compel the termination of the trust, unless he has entered into a contract

17

with the other beneficiaries to consent to the termination of the trust" [emphasis added]).[13]

4. Default. Keramas next argues that the judge abused his discretion in entering default based on noncompliance with the April 2021 order. "[A] judgment of default may enter against a party who disobeys a discovery order." Short v. Marinas USA Ltd. Partnership, 78 Mass. App. Ct. 848, 852 (2011), citing Mass. R. Civ. P. 37 (b) (2) (C), as amended, 390 Mass. 1208 (1984). "Entry or, conversely, removal of default judgments has to do with the management of the case and, as such, is committed to the sound discretion of the trial judge." Greenleaf v. Massachusetts Bay Transp. Auth., 22 Mass. App. Ct. 426, 429 (1986).

Keramas was ordered to produce documents concerning the disposition of either or both the $350,000 withdrawal of trust funds and the $256,285 of proceeds from the sale of the NERA shares in the January 2018,[14] March 2020, June 2020, July 2020,

---

[13] The judge could have terminated the trust without Keramas's consent as long as it was satisfied that "continuance of the trust is not necessary to achieve any material purpose of the trust" and Keramas's interests "will be adequately protected." G. L. c. 203E, § 411 (b), (c).

[14] The January 2018 order required Keramas to produce documents related to the sale of three trust properties in 2015, including "[a]ny and all documents which relate to the present whereabouts of the proceeds" from those sales. The judge also ordered Keramas to produce "[a]ny and all documents which related to the transfer, conveyance, sale or removal of any

18

and October 2020 orders.[15]  In March 2021, a judge ordered that Johnson "is entitled to full and complete discovery from [Keramas] regarding [Keramas's] $350,000 withdrawal from the Trust bank account and the disposition of the $256,000 from the sale of the [NERA] shares."  Johnson's counsel argued at a hearing that if the defendant did not fully comply with the order, then judgment should enter on all Johnson's claims and the counterclaims should be dismissed.  Her counsel stated that "given the three years that [Keramas] has basically stonewalled, I think that's the appropriate action for the court to take at this time."  In April 2021, the judge entered a discovery compliance order directing Keramas to produce "a full, complete and accurate accounting" of both amounts that showed each transfer to present with accompanying monthly statements and cancelled checks.  Keramas was to sign the accounting under penalties of perjury.

_____

money, property, depositary shares or anything of value standing in [the father's name]," including, among other things, the NERA shares.

[15] The March 2020, June 2020, and July 2020 preliminary discovery orders required Keramas to produce, among other things, an unredacted bank statement from the trust account from September 2016 and documents relating to the destination of withdrawals from that account.  In October 2020, the same judge entered another order requiring Keramas to file all communications with respect to his efforts to obtain bank records responsive to the January 2018, March 2020, June 2020, and July 2020 orders.

19

Despite being on notice that Johnson sought to default him, Keramas did not comply with the April 2021 order. Keramas did not produce an accounting as to the $350,000 withdrawal; instead, he stated that he did not have the relevant bank records and was unable to obtain them from the bank. Johnson's counsel countered that he was able to obtain the records at issue, showing the initial transfers of the $350,000, within a month for a $50 fee. Those records, submitted by Johnson, reflect that checks were written from the account directly to Keramas or to his wholly-owned companies, including Acriva; however, Keramas produced no information about any subsequent transfers of those funds, as required by the April 2021 order.

As to the $256,285 from the NERA shares, Keramas asserted that he fully complied with the order. In support, Keramas provided a roughly eighty page, single-spaced "accounting" in narrative form concerning the transfer of the $256,285, not signed under penalties of perjury. That document was supported by some, but not all, redacted bank statements.

At the hearing on Johnson's motion to default Keramas for noncompliance with the April 2021 order, the judge made explicit findings regarding Keramas's noncompliance with the order. Specifically, the judge found that Keramas did not provide proper accounting for the funds, did not sign the accounting for the NERA shares under penalties of perjury, did not produce all

20

supporting monthly statements and cancelled checks, and redacted information for certain accounts.  Those findings supported the judge's determination that Keramas "willfully and intentionally declined to produce the required documents after a long history of discovery related orders and litigation in this case."  We also discern no error or abuse of discretion in the judge's finding that a default, "the most serious sanction," was appropriate because "[t]here is no defense to [Keramas's] failure to comply" and "[t]here is no sanction . . . that would suffice here, other than default.[16],[17]

5. Damages.  Keramas also asserts several errors with the assessment of damages.  Given the default, the "well-pleaded facts are deemed to be admitted, but a plaintiff may recover only to the extent the complaint states a claim for relief."

---

[16] We have reviewed Keramas's claimed errors pertaining to his various representations as to why he could not comply with the discovery orders and conclude that they do not provide a basis to set aside the default or otherwise excuse Keramas's noncompliance with the clear discovery orders.

[17] We discern no abuse of discretion in the decision of the judge to deny Keramas's motions to compel Johnson's answers to interrogatories and to compel production of documents as untimely.  Keramas makes no argument as to how he was prejudiced by these rulings.  See Central Ceilings, Inc. v. Suffolk Constr. Co., Inc., 91 Mass. App. Ct. 231, 241 (2017) ("In general, discovery matters are committed to the sound discretion of the trial judge [and will be upheld] unless the appellant can demonstrate an abuse of discretion that resulted in prejudicial error" [citation omitted]).

21

Nancy P. v. D'Amato, 401 Mass. 516, 519 (1988). "[T]he judge

has an obligation fairly to determine that the amount of damages

has a reasonable basis in fact." Jones v. Boykan, 464 Mass.

285, 294 (2013).

The judge properly declared Johnson as the owner of the CDs

and Alpha accounts based on the allegations that the father

owned them jointly with or in trust for Johnson and ownership

was transferred to her.[18] The judge's finding that Johnson was

entitled to $309,437 -- representing her share of the proceeds

from the first three trust property sales and the insurance

settlement -- for breach of contract also was not error.

The judge's decision to award Johnson $7,500 for the

automobile[19] and to declare her the owner of fifty percent of the

funds in the father's personal accounts also was supported by

the findings. We disagree with Keramas's argument that the

---

[18] Keramas's argument that these assets were trust property
is foreclosed by these allegations in the second amended
complaint that are deemed admitted. Keramas's counterclaim
asserting that the father violated the trust terms by
transferring trust funds to the CDs during his lifetime was
dismissed. Moreover, at most, Johnson's allegations demonstrate
that the father transferred funds back and forth between the CDs
and the trust account and that he used "significant amounts"
from the CDs to purchase two properties held by the trust.

[19] Keramas argues that Johnson presented no support for the
$15,000 value of the automobile. However, the parties agreed at
the damages assessment hearing that the father bought the car
used for that amount. To the extent the value depreciated,
Keramas did not present any evidence of that fact.

second amended complaint failed to state a claim as to those assets because the allegations are conclusive and speculative. Johnson alleged the following. Keramas had his father sign several signature pages (without attachments) on February 26, 2015. He later attached the signatures to documents granting Keramas access to the father's accounts and appointing Keramas as the father's attorney-in-fact. Keramas took possession of the funds in the father's personal accounts (referenced by account number) through "impersonation, misrepresentation, forgery or improper use of power of attorney." Keramas also "forged his father's name to the title for the Mercedes, or improperly used the power of attorney for that purpose," then sold the vehicle and used the funds. These allegations meet the heightened standard to plead claims related to fraud "with particularity," Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974), and are sufficient in the circumstances. Cf. 5A C.A. Wright, A.R. Miller, & A.B. Spencer, Federal Practice and Procedure § 1298 (2018) (Federal "[r]ule 9[b]'s fraud pleading requirement should not be understood to require absolute particularity as to matters peculiarly within the opposing party's knowledge that the pleader is not privy to at the time of the pleading and that can only be developed through discovery").

The judge also made sufficient findings to support his decision to award Johnson one-half of the sale proceeds

23

($128,142) and dividends ($10,124) from the NERA shares. Although Keramas also argues that Johnson failed to state a claim as to these assets, the allegations in the second amended complaint, including those that describe in detail when and how Keramas sold some shares and diverted the dividends from the remaining shares, are clearly sufficient to meet the pleading requirement.

Finally, the judge's finding that Keramas took $337,450 as "advanced Trust funds" was not erroneous. That amount was based on Keramas's accounting showing that while he was trustee, he transferred $189,750 from the trust to himself or Acriva for "management and other types of fees" and he paid $147,700 in legal fees to four law firms. The judge was within his discretion to deny Keramas's request for trustee fees. See Wasserman v. Locatelli, 343 Mass. 82, 87 (1961) (judge may allow, deny, or reduce trustee's compensation in event of breach of trust). The trust did not have a provision concerning fees. Keramas sold three trust properties and transferred $350,000 funds to himself, later asserting he was owed over $1 million in trustee fees. As to the remaining two properties, Keramas failed to respond to tenants' complaints, did not make necessary repairs, and instead distributed the rent income from these properties to himself and Acriva. In the circumstances, the judge did not err in determining that Keramas (or Keramas's

24

alter ego, Acriva) "should not be paid for improper service." Walsh v. Atlantic Research Assocs., 321 Mass. 57, 66 (1947). See McIntire v. Mower, 204 Mass. 233, 235 (1910) ("the court may refuse to allow any compensation to a trustee who has been guilty of misconduct"). Johnson also demonstrated that Keramas used trust funds to pay attorney's fees for work unrelated to the trust and the judge did not abuse his discretion in declining to award any of the remaining fees where Keramas, as trustee, was at fault. See Lattuca v. Robsham, 442 Mass. 205, 210 (2004).

6. Postjudgment motions. Keramas argues that the judge should have allowed his motion to enforce an automatic stay and for sanctions and his motion to enjoin Johnson from conducting postjudgment discovery during the automatic stay period. Although the judgment permitted Johnson to "immediately" withdraw certain funds from the trust account, Keramas argues that Johnson was not permitted to do so while this appeal was pending. Under Mass. R. Civ. P. 69, 365 Mass. 836 (1974), the trial court seemingly has some discretion to determine whether payment should be made prior to the entry of execution on judgment at the conclusion of appellate review. See Mass. R. Civ. P. 69 ("Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise" [emphasis added]). See also G. L. c. 235, § 16

25

(execution on judgment issues after appellate review is exhausted).  In any event, as the trustee, Johnson had "the power to take any action [she] deems beneficial to the trust." See Ferri v. Powell-Ferri, 476 Mass. 651, 661 (2017) ("the trustee of a terminated trust retains ongoing duties to control and protect the trust assets, and may continue to act pursuant to the powers provided under the trust instrument").  She could take possession of the trust funds here to preserve them; however, she remains under an ongoing obligation, as trustee, to produce the funds to the appropriate party after appellate review is exhausted.

As to postjudgment discovery under Mass. R. Civ. P. 69, Johnson was permitted to engage in postjudgment discovery while an appeal is pending "to sniff for assets . . . from which the judgment could be realized."  Evans v. Multicon Constr. Corp., 30 Mass. App. Ct. 728, 732 (1991).  Cf. Melo-Tone Vending, Inc. v. Sherry, Inc., 39 Mass. App. Ct. 315, 320-321 (1995) (imposing sanctions for noncompliance with postjudgment discovery order while appeal was pending); Sommer v. Monga, 35 Mass. App. Ct. 761, 764 (1994), cert. denied, 513 U.S. 1169 (1995) (same).[20]

---

[20] In some instances, Keramas advances the same arguments for different rulings, i.e., that his motion to dismiss should have been allowed for the same reasons that Johnson should not have been granted leave to amend her complaint.  Where we do not separately address these rulings, we have considered Keramas's arguments on each motion.  To the extent Keramas argues that the

Conclusion. The judgment is affirmed. The orders dated November 18, 2021, and February 15, 2022, are affirmed.[21]

So ordered.

By the Court (Blake, C.J., Meade & Tan, JJ.[22]),

Clerk

Entered:  May 6, 2026.

---

judges displayed bias toward him, we disagree based on our review of the record. "Other points, relied on by [Keramas] but not discussed in this [decision], have not been overlooked. We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).

[21] Keramas's request for attorney's fees related to this appeal is denied.

[22] The panelists are listed in order of seniority.

27